## Henderson *et al. versus* Hunter *et al.*

1. A lot was granted to trustees, naming them, "and their successors in trust for the uses," &c., thereinafter mentioned, to hold "to the said trustees and their successors in office for ever in trust," to build a house of worship for the members of the Methodist Church, "so long as they use it and no longer, and then to return back to the original owner," according to the rules and discipline from time to time adopted by the General Conference. *Held,* that the estate in the trustees terminated when the house ceased to be used as a place of worship according to the discipline of the church.

2. The legal estate of the trustees endured no longer than the use it was designed to protect.

3. The trustees being unincorporated and having no legal succession, "*successors*" will not continue the estate beyond its appropriate use.

4. The equitable estate is in the members of the church only so long as they use it as a place of worship, and this limit being transcended the estate returns to the grantor.

5. The abandonment of the house as a place of worship, unless by the church authority according to the discipline then existing, would not *ipso facto* determine the use.

6. The discipline takes from the laity of a Methodist church the power to continue any house as a place of worship, according to the rules of the church, after the ecclesiastical authority has resolved to discontinue the services of its preachers there.

7. To worship as members, and under the discipline, they must accept the preacher sent by the bishop.

8. The discipline does not definitely give the bishop authority of removing a place of worship; but the rule in the civil courts is, that churches are left to speak for themselves in discipline and doctrine.

9. Whether trustees in a grant of land for a place of worship before 1864, can be changed according to the discipline of the Methodist Church of that year, *dubitatur*.

10. Such a deed is a contract between the grantor and the trustees, and even the legislature cannot impair the contract.

11. The constitution and government of the Methodist Episcopal Church in the United States examined and stated.

November 2d 1868. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., absent.

[Henderson *v.* Hunter.]

Error to the District Court of *Allegheny county:* No. 29, to October and November Term 1868.

This was an action of trespass q. c. f. brought to July Term 1867, by John Henderson, John Nixon, James Carson and Clark McKelvy, trustees of the Springdale Methodist Episcopal Church against John Hunter and others. The trespass alleged was the tearing down and taking away the church building at Springdale.

The plaintiffs gave in evidence a deed dated May 6th 1856, between Thomas Pillow and wife and the plaintiffs, "trustees," &c., by which the grantors granted, &c., to the plaintiffs "and their successors, trustees in trust for the uses and purposes hereinafter mentioned and declared," a lot "on which is erected a Methodist Episcopal church," to hold, &c., "unto them, the said trustees and their successors in office, for ever in trust; that they shall erect, &c., thereon a house or place or worship for the use of the members of the Methodist Episcopal Church in the United States of America (so long as they use it for that purpose, and no longer, and then to return back to the original owner), according to the rules and discipline which from time to time may be agreed upon and adopted by the ministers and preachers of the said church at their General Conference in the United States of America, and that they shall, at all times, for ever hereafter, permit such ministers and preachers belonging to the said church, as shall from time to time be duly authorized by the General Conferences of the ministers and preachers of the said Methodist Episcopal Church, or by the annual conferences authorized by the said General Conference, to preach and expound God's holy word therefrom; and that as often as any one of the trustees hereinbefore mentioned, shall die, or cease to be a member of the said church, according to the rules and discipline as aforesaid, then and in such case it shall be the duty of the stationed minister or preacher (authorized as aforesaid) who shall have the pastoral charge of the members of the said church, to call a meeting of the remaining trustees as soon as conveniently may be, and when so met with the said minister or preacher, shall proceed to nominate one or more persons to fill the place or places of him or them whose office or offices have been vacated as aforesaid; * * and the said trustees so assembled shall proceed to elect, and by a majority of votes appoint, the person or persons so nominated to fill said vacancies, in order to keep up the number of nine trustees for ever; and in case of an equal number of votes for and against said nomination the stated minister or preacher shall have the casting vote. * * And the said Thomas Pillow and wife warrant, and for ever defend, the before-mentioned and described lot or piece of land with the appurtenances thereunto belonging unto them the said trustees and their successors, chosen and appointed as aforesaid, "&c.

[Henderson *v.* Hunter.]

The deed is in the form prescribed by the discipline of the church as it was in 1860, except the part providing that the lot should revert to the grantor if abandoned as a place of worship, &c.

The plaintiffs proved also the taking down and removal of the building by the defendants, and rested. The defendants then, under objection by the plaintiffs and exception, gave in evidence the minutes of the Quarterly Conference of the Springdale Circuit of January 4th 1866, showing that James Henderson, John Nixon, S. Harrison, William McKelvy and R. Nixon were elected trustees of Springdale, and of February 17th 1867, showing that John Nixon, James Henderson, George Shoop, George Keyser and Joseph Hosic were elected trustees.

The plaintiffs, in rebuttal, gave evidence by several witnesses that they with five others of the original donors were members of the church when it was torn down; that there was a meeting in April 1867, at which nine members and S. P. Wolf the presiding elder were present; Mr. Wolf called the meeting to order, and stated that its object was to take a vote as to taking the church down; there were but two persons voting for taking the church down:

Mr. Wolf testified for the defendants that the church as a preaching-place was abandoned by the congregation early in March 1867; this action was by the bishop and his council of presiding elders; any preaching in it afterwards was without the sanction or authority of the church. After this, having been informed that there was some dissatisfaction in the society, witness called a meeting; those who were dissatisfied, being about one-fifth of the society, proposed that if there should be preaching in a school-house in the vicinity, the building might be taken down and used as should be thought best; the witness accepted the proposition. After this, the dissatisfaction not having been allayed, the meeting of April was held, at which two voted against the removal, one did not vote, and the remainder voted for the removal. A new building for the church was erected, the materials of the old being used in its erection; the new building has been adopted as the place of worship of the society. At the time of the meeting the society numbered forty members; thirty-three were in favor of the removal.

They gave in evidence also the books of discipline of the church, containing the discipline of 1860 and that as modified by the General Conference in 1864. By the last the mode of electing trustees was changed, and it was provided that they should be elected annually by "the fourth quarterly conference of the circuit or station, upon the nomination of the preacher in charge or presiding elder of the district," and all trustees shall hold their office until their successors are elected. The elections of trustees in 1866 and 1867 were under the discipline of 1864.

9 P. F. SMITH—22

[Henderson *v.* Hunter.]

The court (Hampton, P. J.), after referring to the evidence, charged:—

"The evident intention and design of the grantor was to subject this property to the use, management and control of the Methodist Episcopal Church, according to the discipline, as it was then, or as it might thereafter be changed by competent authority, to have and hold the same, as long as they might think proper to use it as a place of worship. But whenever it should be abandoned, or cease permanently to be so used, then it was to revert to him; and the grant was to determine. This is very clear from the express terms of the deed. The question then arises, did it cease, by competent authority, to be used as 'a house or place of worship for the use of the members of the Methodist Episcopal Church in the United States of America,' and if so, was it abandoned before this building was removed by the defendants?

"By reference to the discipline of the church, it will be found that the bishop, with his council of presiding elders, has the exclusive power of determining at what place or places, in what house or houses, there shall be preaching, and what minister or ministers shall perform divine service; and preaching at any other place, or in any other house, than that designated by the authority aforesaid, is without the sanction of the church. How, then, was the fact here? The Rev. Mr. Wolf, the presiding elder then and now, says: 'This church, as a preaching-place, was abandoned by the Conference in the early part of March 1867. This action was by the bishop and his council of presiding elders, and the preaching removed to the school-house in the village, until a new church could be built; and any preaching in this church building, after the Conference, was without the sanction or authority of the church. This abandonment was primarily because the building was unfit and unsafe as a place of public worship; and, secondly, because the place where the new church was erected was more central and convenient for the congregation.'

"It is very clear from this evidence, if believed by the jury, that this house ceased to be used, and was finally abandoned by the authority of the church as early as last March, some time prior to its being removed by the defendants.

"Again, by the Book of Discipline, as published in 1864, it appeared that the General Conference that year changed the mode of electing trustees from what it was when this deed was made. It is now provided by that change that they are to be. elected annually by 'the fourth quarterly conference of the circuit or station, upon the nomination of the preacher in charge or presiding elder of the district,' and all trustees shall hold their office until their successors are elected. In the present case it appears by the record of the quarterly conference of this circuit, that

[Henderson v. Hunter.]

elections were held in accordance with the foregoing rule in 1866 and 1867. At the election of February 1867 John Nixon, James Henderson, George Shoop, George Keyser and Joseph Hosic, were elected trustees for the ensuing year. This election of course superseded the trustees of the preceding and all former years, whether they happened to be the same persons or not; and the defendants have given evidence for the purpose of showing that in taking down and removing this church they acted in accordance with the instructions of these trustees, and they in their turn allege, and have given evidence tending to show, that they acted according to the wishes of a large majority of the members of the church who worshipped in that house.

"Now, if you should believe from the evidence, first, that the bishop and his council of presiding elders abandoned this house for ever as a place of worship some time before it was taken down and removed to its present place; and, second, that new boards of trustees were elected for the years 1866 and 1867, as shown by the church record, and that the removal of this building was authorized by them for the reasons before stated; and third, that a large majority of the members of this church advised and consented to the removal, then the plaintiffs have no right to recover, and your verdict should be for the defendants."

The verdict was for the defendants; and the plaintiffs took out a writ of error.

The errors assigned were:—

1. The admission of the minutes of conference in evidence.

2. That the court decided that the General Conference had power to change the mode of appointing trustees, so as to take from the grantor, the donors of the fund to build the church and the trustees in the deed, the control of the property granted.

3. Charging that the design of the grantor was to subject the property to the uses, management and control of the present or any future discipline of the church.

4. Charging that if the quarterly conference decided to abandon the church as a place of public worship they might take the building down and carry the material with them.

5. In submitting to the jury the question whether and intimating that a large majority of the congregation approved the removal of the church, and this against the positive evidence in the case.

*J. Barton*, for plaintiffs in error.

*White & Slagle*, for defendants in error.

The opinion of the court was delivered, January 4th 1869, by AGNEW, J.—This was an action of trespass by church trustees.

[Henderson *v.* Hunter.]

under a deed of trust made by Thomas Pillow in 1836, for taking down and removing the materials of a church building in 1867. The case turns on the limitation in the deed. The legal estate of the trustees clearly has no duration beyond the use it was intended to protect. The word "successors" is used to perpetuate the estate, but as the trustees are an unincorporated body having no legal succession, there is nothing in the terms of the grant to carry the trust beyond its appropriate use. This brings us to the limitation of the use itself.

It is for the erection of "a house or place of worship for the *use* of the members of the Methodist Episcopal Church of the United States of America (so long as they use it for that purpose, and no longer, and then to return back to the original owner), according to the rules and discipline which, from time to time, may be agreed upon and adopted by the ministers and preachers of the said church at their General Conference in the United States of America." This is the main purpose of the trust, the other portions of the deed relating to the use being ancillary only to this principal object. The interjected words, "so long as they use it for that purpose and no longer, and then to return back to the original owner," are terms of undoubted limitation, and not of condition. They accompany the creation of the estate, qualify it, and prescribe the bounds beyond which it shall not endure.

The equitable estate is in the members of the church so long as they use the house as a place of worship in the manner prescribed, and no longer. This is the boundary set to their interest, and when this limit is transcended the estate expires by its own limitation, and returns to its author. The words thus used have not the slightest cast of a mere condition. No estate for any fixed or determinate period had been granted before these expressions were reached, and they were followed by no proviso or other indication of a condition to be annexed.

"A special limitation," says Mr. Smith, in his work on Executory Interests, p. 12, "is a qualification serving to mark out the bounds of an estate, so as to determine it *ipso facto* in a given event without action, entry or claim, before it would, or might, otherwise expire by force of, or according to, the general limitation." A special limitation may be created by the words "until," "so long," "if," "whilst" and "during," as when land is granted to one *so long* as he is parson of Dale, or *while* he continues unmarried, or *until* out of the rents he shall have made 500*l.* : 2 Black. Com. 155; Smith on Exec. Int. 12; Thomas Coke, 2 vol., 120–21; Fearne on Rem. 12, 13 and note p. 10. "In such case," says Blackstone, "the estate determines as soon as the contingency happens (when he ceases to be parson, marries a wife or has received the 500*l.*), and the subsequent estate which depends

[Henderson *v.* Hunter.]

on such determination becomes immediately vested, without any act to be done by him who is next in expectancy."

The effect of the limitation in this case was that the estate of the trustees terminated the moment the house ceased to be used as a place of worship according to the rules and discipline of the church, by the members to whose use in that manner it had been granted; and the reversion *ipso facto* returned to Thomas Pillow, the grantor. The abandonment of the house as a place of worship, therefore, became a chief question in the cause, because the title of the trustees to the property, and consequently their right to maintain this action, hinged upon this event. Then, as the use of the members of this church was to be according to the rules and discipline from time to time adopted by the General Conference, it became a question whether the alleged abandonment of the house as a place of worship was by church authority, and according to the rules and discipline then existing; for a mere temporary suspension of services there, or a discontinuance of the use without authority, would not, *ipso facto*, determine the use. Hence an inquiry both into the fact of abandonment and the authority of the church became essential.

According to the constitution and discipline of the Methodist Episcopal Church of the United States, its preachers, denominated deacons and elders, are not called by the societies to which they preach, but are appointed to stations, and to travel in circuits, by the presiding bishop of the annual conference. The power is lodged in him, but from a practical necessity he acts with the advice of his council of presiding elders assembled at the annual conference. The government of the church is clerical and not lay. It has no admixture of the laity, excepting in the quarterly conference of the circuit or station, in which certain lay official members are admitted to seats *ex necessitate rei*. The annual conferences are composed of the deacons and elders in the travelling ministry within the respective conferences, presided over by a bishop or superintendent, as originally termed, assigned to hold the conference by the board of bishops. The general conference consists of delegates, elected by all the annual conferences from among the travelling preachers, presided over by the bishops in turn, and holding its sessions quadriennially.

The annual conferences are divided into districts, composed of the circuits and stations within their respective boundaries. Over each district the bishop, at the annual conference, appoints an elder to preside, who travels his district four times a year, and presides at the quarterly conferences in each circuit or station, composed of the travelling and local preachers, exhorters, stewards, class leaders, trustees and first male superintendent of Sunday schools. A station has a single place of stated public service, while a circuit has several. It is to these circuits and stations

[Henderson *v.* Hunter.]

the travelling preachers are assigned at every annual conference. In his circuit or station the preacher in charge arranges or "plans" the appointments of service during the term of his own appointment.   In planning the circuit he *may* take the advice of the stewards, if he choose to ask it; and in arranging the appointments for service it is his duty to give the local preachers within his charge regular and systematic employment on the Sabbath.

No specific directions are found in the discipline as to the arrangement of the appointments, and the whole subject seems in a great measure committed to the sound discretion of the travelling preacher in charge, subject only to the discipline duty of preaching where there is the greatest number of quiet, willing hearers, the most fruit, and where the Spirit most abounds; and subject to the superintending control of the presiding elder, whose duty it is to oversee the spiritual and temporal business of the church; to take charge of all elders and deacons in his district, and to take care that the discipline shall be enforced in his district.

As to the particular building or house in which services shall be statedly held, there is nothing definite in the discipline, and the authority over it seems to be only inferential, arising out of the power of the preacher in charge to arrange the appointments of service, which must include places as well as times of appointment. This vagueness probably flows from the fact that at just this point the boundary of church polity interlocks with the lines of popular support, for money and members must come from the laity.   Still church polity reserves a large share of control over church property, as will be seen in the chapter on this subject; with a sorrowful recognition, however, of its dependence, for plainness and economy in the building of churches is enjoined, lest the necessity of raising money make *rich* men necessary to the church, and if so (says the discipline), "we must be dependent on them, yea, governed by them, and then farewell to Methodist discipline, if not doctrine, too."

In order to preserve control, however, it is made the duty of the quarterly conferences to secure the ground on which churches are to be built according to the deed of settlement, and to admit no charter or deed that does not secure the rights of the preachers of the church in the ministration of its services according to the true meaning of the deed of settlement, the form of which is prescribed.

Thus the effect of this active control of the clerical authorities of the church over preachers, preaching, and church property, is to take from the society at large, or laity, the power of continuing any building as a place of worship according to the rules and discipline of this church, after the ecclesiastical authority has resolved to discontinue the services of its preachers there.   The society might choose to worship there of their own head, and call a

[Henderson *v.* Hunter.]

preacher of their choice who was willing to come without the authority of his church, but in doing so they would cut themselves off from their church connection, and would be worshipping there no longer as members of this church under its rules and discipline; for to worship as members and under the discipline they must accept the travelling preacher sent to them by the bishop. Consequently, the trust in this case ceased when the proper church authorities, acting under and according to the rules and discipline, totally abandoned the building as a place of worship for the members of this church.

The fact of such an abandonment was submitted by the judge and found by the jury. In his charge the learned judge submitted the question on the testimony of the presiding elder and the book of discipline as to the authority for so doing; and on his testimony and that of others as to the actual discontinuance of services there, and the causes thereof. This was all he could do, as the question of fact belonged to the jury.

The reverend gentleman had testified that the church had been abandoned by the conference in March 1867, and that this action having been taken by the bishop and his council of presiding elders, and the preaching removed to the school-house in the village, any preaching in this building after the conference, was without the sanction or authority of the church.

I must say I have not discovered in the discipline the precise ground of the bishop's authority to do this; yet it may be a proper understanding of his authority as gathered from the entire body of church law, and the rule in the civil court is that the churches are left to speak for themselves in matters of discipline and doctrine: German Reformed Church *v.* Commonwealth, 3 Barr 282. But however the fact may be, where the precise power is lodged, certain it is in this case this proof was made, and with it the fact that the abandonment of the building had also the express sanction of the presiding elder, and inferentially the sanction of the preacher in charge.

We cannot say, therefore, that the fact of abandonment was submitted without sufficient evidence. The fact being found by the jury, these plaintiffs—at the time of the removal of the building—were no longer trustees of the property by the very terms of the limitation in the deed, and had no ownership or estate to enable them to maintain this action.

This is sufficient for the purposes of this case. But it is also insisted that these trustees were superseded by the election of new trustees by the quarterly conference under a new rule adopted by the General Conference of 1864. We shall express no opinion on this point, the interest depending on the form of the deeds made previous to 1864, being too important to be determined upon a meagre presentation of the case to us. It is proper, however, to suggest to the church authorities that this is perhaps perilous

[Henderson *v.* Hunter.]

ground to stand upon.   The church may provide a new mode for the election of trustees, and make their deeds hereafter conform to this mode.   But when it comes to the right to supplant trustees established by contract, or to fill vacancies in a mode differing from the terms of the contract, which are the laws of the trust, a new question arises.

A deed is a contract *inter partes*, the grantor on one side and the trustees on the other, and even the legislature cannot impair the contract.   If conflicts should arise between the trustees nominated or provided for in the deed and those appointed by the quarterly conferences, it may be found difficult to overthrow the will of the grantor or first party in the deed expressed in this contract form.

Judgment affirmed.