**Darryl M. JACOBS and Suzanne M. Jacobs, his wife, and Penneco Energy Corp., Plaintiffs,**

v.

**CNG TRANSMISSION CORP., Defendant.**

**No. CIV.A. 96–319.**

United States District Court, W.D. Pennsylvania.

July 6, 2004.

Robert W. Lambert, Esquire, Indiana, PA, for plaintiff.

Stanley Yorsz, Esquire, Stanley Parker, Jennifer S. Parks, Esquire, Buchanan Ingersoll, Pittsburgh, PA, for defendant.

## OPINION

CERCONE, District Judge.

Plaintiffs commenced this action in the Court of Common Pleas of Armstrong County, Pennsylvania, on January 19,

1996, by filing a complaint in equity seeking (1) an accounting of natural gas extracted, withdrawn, or produced on certain property located in Armstrong County, Pennsylvania, (2) a finding that an oil and gas lease entered by plaintiffs' and defendant's predecessors has terminated and (3) a declaration quieting title to the oil and gas interests underlying the property in plaintiffs. Defendant removed the action to this court based upon diversity of citizenship. The litigation has become protracted, involving proceedings before the United States Court of Appeals for the Third Circuit and the Supreme Court of Pennsylvania. Presently before the court are cross motions for summary judgment following a remand from the Third Circuit. For the reasons set forth below, plaintiffs' motion will be granted in part and defendant's motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir.1992).

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial,*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Fed.R.Civ.P. 56(a), (e)) (emphasis in *Matsushita*). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." *Harter v. GAF Corp.,* 967 F.2d 846 (3d Cir.1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382–83 n. 12 (3d Cir.1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Big Apple BMW, Inc. v. BMW of North America,* 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993) (although the court is not permitted to weigh facts or competing inferences, it is

no longer required to "turn a blind eye" to the weight of the evidence).

The historical facts underlying the parties' respective positions are not in dispute. Plaintiff purchased 120 acres of real estate in South Bend Township, Armstrong County, Pennsylvania, on December 7, 1994 ("the property"). The deed to the property was encumbered by and transferred "UNDER AND SUBJECT" to a certain oil and gas lease given by Frank F. George and Sarah T. George, his wife, to New York State Natural Gas Corporation, dated February 21, 1956 ("the lease"). Plaintiffs were aware of the encumbrance and had an opportunity to review the lease before purchasing the property. Plaintiffs also were aware that defendant was operating an underground natural gas storage pool at what is known as the "Hundred Foot" sand formation, which is located fewer than 2000 feet below the surface of the property. Defendant has operated a natural gas storage field under the property in conjunction with other surrounding property since the 1950's. The collective natural gas storage field is known as the South Bend Natural Gas Reservoir.

The original oil and gas lease on the property dates back to August 17, 1907, when landowners named McKalips entered into an oil and gas lease with a predecessor to New York State Gas Corporation. The oil and gas lease periodically was renewed by successive lessees over the years until it was substantially overhauled in 1956. The 1956 lease permitted New York State Natural Gas Corporation to drill and operate wells for the production of oil and gas and also to use the property for the pooling or storage of gas. Plaintiffs are the successors in interest to the McKalips' and Georges' interests as a result of their 1994 purchase of the property. Defendant is the successor in interest to New York State Natural Gas Corporation. The parties' respective rights under the lease are at the heart of the instant litigation.

The parties' disagreements concerning their respective contractual and property rights under the lease place at issue the import of various terms and phrases contained therein. Instruments conveying property rights in minerals such as oil and gas are executed in the context of an industry that is highly technical in nature and employs district terminology used by those involved in the business. *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584, 592 (1984). An understanding of the historical development of the industry is essential in making an informed assessment concerning the intent of the parties in employing the language utilized in a particular instrument. *Id.; accord Venture Oil Co. v. Fretts*, 152 Pa. 451, 25 A. 732 (1893) (an agreement for the production of oil and gas must be construed both with reference to the known practices within the industry and the evident intention of the parties).

The modern oil and gas lease is the evolutionary product of years of conflicts between landowners and lessee/operators acquiring an interest in the mineral. *See* 3 Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW (2003 ed.) § 601. Many of the basic contractual concepts and correlating principles of law governing such leases were established between the 1880's and the 1940's. *Id.* at § 601.1. It is universally recognized within the field that oil and gas leases commonly contain several key provisions, including the "granting clause," the "habendum clause," the "royalty clause," and the terms of surrender. *See id.* at § 603 (habendum clause); § 605 (granting clause); § 641 (royalty clause); and § 611 (dry whole cessation and drilling provisions); *see also* 2 W.L. Summers, THE LAW OF OIL AND GAS (Perm. ed.1959) at Chapter 7 (granting clause);

Chapter 10 (habendum clause) and Chapter 11 (drilling, rental and surrender clauses).

Here, the dual purpose of the lease is set out in paragraph one, designated as the "Leasing Clause" (i.e., the granting clause), which provides in pertinent part:

> That the Lessor, for and in consideration of the sum of One ($1.00) Dollar in hand well and truly paid by the Lessee, the receipt whereof is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the Lessee to be paid, kept and performed, has leased and let and by these presents does lease and let unto the Lessee for the purpose of drilling and operating for and producing oil and gas, and for the further purpose and with the exclusive right in the Lessee, as it may see fit to store any kind of gas therein by pumping or otherwise introducing the same into any sand or sands, substrata or horizon in and under said land, and the right to remove the same by pumping or otherwise through any well or wells on said land or other lands with the right to open, repair, maintain and use a roadway or roadways to wells or well locations on this or other lands and the right to construct, lay, maintain, operate, change and remove pipe lines, telephone and telegraph lines and all other appliances and structures on, over and through said lands, and with all other rights and privileges, including free oil, gas, gasoline and water from the land, necessary or convenient for the operation of this land alone or conjointly with other lands for the transportation of oil and gas produced from said land or other lands or for introducing, storage or withdrawing of gas from this land or other lands....

Lease at ¶ 1. The granting clause thus initially conveys to the lessee the right to drill for and produce oil and gas from the property and the right to use various portions of the property for the storage of gas, with the concomitant right to use the surface of the property in any manner necessary to effectuate either or both purposes.

Pursuant to the "habendum clause", the lease is to remain in effect for a term of ten years from June 16, 1956, "and as long thereafter as [the property], or any portion thereof, or any other land pooled or utilized therewith as provided in paragraph 4 hereof, is operated by [the defendant] in search for or production of oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises by [defendant]." *Id.* at ¶ 3.[1]

---

**1.** A habendum clause is used to fix the ultimate duration of an oil and gas lease. 2 Summers, THE LAW OF OIL AND GAS § 281. "The habendum clause of the modern oil and gas lease is the result of a long process of development, in which many influences have aided in shaping its final form," chief of which have been the district interests of the lessor and lessee, the peculiar needs of the industry and the interpretation and enforcement of certain phrases by the courts. *Id.* at § 282. Experimentation in the industry for a suitable durational term progressed from definite term leases, which placed the lessee at a disadvantage if production was only attained late in the term or extended beyond the term, to a definite term with an option to renew, to long term leases with conditional clauses extending the term through the production life of the land. *Id.* at §§ 283–287.

The typical habendum clause of a "modern" oil and gas lease provides in effect that the interest conveyed by the lease shall continue for a prescribed term of years, for example 5 or 10 years, and "as long as" or "so long as" one or more particular minerals are produced in paying quantities or some other specified activity continues. 3 Williams and Meyers, OIL AND GAS LAW § 603. A number of variant forms of habendum clauses have been used in the industry, and most have been interpreted by the courts to present variations in form

Defendant also was "granted the right to pool and utilize the Onondaga, Oriskany or deeper formulations under all or any part of the [property] with any other lease, or leases, or land or lands, mineral estates, or any of them whether owned by the [plaintiffs] or others, so as to create one or more drilling or production units." Lease at ¶ 4. In conjuncture with this right, defendant was given the authority to designate a portion of the acreage covered by any drilling or production unit, subject to the payment of royalties as provided in the lease. It was agreed that if a production unit was created pursuant to this right, then that unit would "have the same effect upon the terms of this lease as if a well were commenced, drilled, completed or producing on the [property]." *Id.*

The lease segregates payment to the lessor into separate forms. First, the lessor is to receive royalties in the form of (1) one-eighth of the value of all oil produced from the property, (2) $50 every three months for each shallow gas-producing well and (3) one-eighth of the value of all gas produced from each deep gas-producing well.[2] Second, the lessor is to receive from any gas-producing well up to 200,000 cubic feet of gas per year for personal use for heating or lighting in one dwelling house situated on the property. *Id.* at ¶ 6.

Third, in addition to royalties and free gas, the lease provides for the payment of delay rental and storage privileges.[3] The "delay rental" clause provides:

rather than substance. *Id.* One such typical form provides as follows:

It is agreed that this lease shall remain in full force for a term of ___ years from ___ date, and as long thereafter as . . . .

*Id.* at § 603.1. This form of a habendum clause came to be commonly used after the experimentation in the industry progressed as noted above in an effort to accommodate the competing equitable interests, needs of the industry and public policy considerations taken into account by the courts in construing and enforcing oil and gas leases. *See generally* 2 Summers, THE LAW OF OIL AND GAS § 281–292; 3 Williams and Meyers, OIL AND GAS LAW §§ 601.1–602.6. The clause is understood as establishing a short definite (or primary) term in which the lessee may operate the property, with an option for an indefinite secondary term that will permit the lessee to reap the long-term value of and return on the investments made in developing the property during the initial primary term. *See* 2 Summers, THE LAW OF OIL AND GAS § 292; 3 Williams and Meyers, OIL AND GAS LAW § 601.4.

In the Appalachian Basin it is not unusual for leases to contain habendum clauses referring to various operations on the premises as alternative means of extending the lease into the secondary term. 3 Williams and Meyers, OIL AND GAS LAW § 603.3(f). One of these is the storage of non-native gas on the property. *Id.*

2. Subsequent legislation enacted by the Commonwealth of Pennsylvania has converted the

gas production royalty to one-eighth of the value of all gas produced from the property, regardless of whether it is produced from a shallow or deep well. *See* 58 P.S. § 33.

3. "Delay rental" and similar deferral payment clauses were developed in conjunction with the short definite term lease containing a "thereafter" provision in the habendum clause. 2 Summers, THE LAW OF OIL AND GAS § 288. One function of these clauses was to eliminate the ability to attack the early lease forms as creating executory contracts. *Id.* at § 242. While a number of courts initially determined that a lease that did not obligate the lessee to develop the property was to be upheld against a legal challenge for want of consideration where it contained a surrender clause and reflected a nominal cash payment for consideration, some courts in equity ignored the legal doctrine that the consideration paid need not be adequate. These courts of equity often refused claims of specific performance or permitted the lessor to cancel the lease pursuant to a theory that the initial consideration supported the lease for the exploratory period only, and if the lessee had not developed the property, the lease was voidable at the option of the lessor due to the lack of consideration. *Id.* These cases typically arose under leases that did not place a binding duty on the lessee to drill or pay rental. *Id.*

The other (and ultimately more important) function of the "delay rental" clause was to

Lessee covenants and agrees to pay a rental at the rate of thirty ($30.00) dollars quarterly in advance, beginning June 16, 1956, until a well yielding royalty to the lessor is drilled on the premises, or until any sand or sands under the leased premises is utilized for the storage of gas and rental for said storage becomes payable as hereinafter provided, any rental paid for time beyond the date of completion of a well yielding royalty shall be credited upon the first royalty due upon the same. It is agreed that lessee may drill or not drill on the leased premises, as it may elect, and that the consideration and rental paid and to be paid constitute adequate compensation for such privilege.

*Id.* at ¶ 5. The "payment for storage privileges" clause provides:

In full compensation for the storage rights herein granted and in lieu of all delay rentals or royalty due or to become due for the right to produce or for the production of oil or gas from the Sands, Strata, or Horizons where gas may be stored as herein provided, lessee covenants and agrees to pay lessor when no wells on the leased premises are utilized for the storage of gas, an annual

storage rental of one hundred twenty ($120.00) dollars, at a rate of one ($1.00) dollars, per acre, per annum, payable quarterly in advance, beginning at the next payment date after gas shall have been stored under the terms of this agreement and continuing until the leased premises shall no longer be used for storage purposes, or until wells on the leased premises are utilized for the storage of gas, in which event lessee shall cease paying storage rental to lessor and pay in lieu thereof, a storage well rental or royalty of fifty ($50.00) dollars, per well quarterly in advance, as long as such wells shall be so utilized; subject to the right of cancellation or surrender hereinafter provided.

*Id.* The lease specifies how the payment of any royalties or rentals is to be made. *Id.* at ¶ 7.

Finally, the lessee may surrender all or any portion of the lease. The surrender provision provides in pertinent part:

It is agreed that said Lessee may at any time remove all machinery and fixtures placed on said premises; and further, upon the payment of one (1.00) dollar and all amounts due hereunder Lessee shall have the right to surrender

---

relieve the lessee of the immediate obligation to develop the property that came to be either expressly or impliedly incorporated into oil and gas leases and provide the lessee with an option to delay production until a convenient or opportune time during the primary term. 3 Williams and Meyers, OIL AND GAS LAW § 601.5; 2 Summers, THE LAW OF OIL AND GAS §§ 287–288. The lease forms used early on in the development of the industry contained an expressed obligation for the lessee to develop the property or suffer a forfeiture. 2 Summers, THE LAW OF OIL AND GAS § 287. Even where the lease did not contain such a clause, the courts recognized an implied covenant to develop the leasehold by drilling exploratory wells immediately and additional wells within a reasonable period of time. 3 Williams and Meyers, OIL AND GAS LAW § 601.1. The industry

eventually developed a lease that obligates the lessee to develop the land for production or pay a rental for delay, which became known as a "drill or pay lease." 3 Williams and Meyers, OIL AND GAS LAW §§ 601.5 & 605.1. Early forms of these leases then began to include a surrender clause, and commonly were referred to as a lease containing a drill or pay or surrender option. *Id.* at § 605.1. "A lease with a habendum clause, consisting of a short definite term with the addition of the 'thereafter' clause, with a drilling clause of the 'drill or pay' plus the surrender clause, or with a drilling clause of the 'unless' type, became the predominant type of lease for oil and gas in the [1890's], and has continued up to [1959]." 2 Summers, THE LAW OF OIL AND GAS § 288.

this lease at any time as to all or any part or parts of the land covered by the same and thereupon shall be released and discharged from all payments, obligations, covenants and conditions herein contained whereupon this lease shall be null and void as to the land in respect to which a surrender is made . . . .

Lease at ¶ 8.

The lease in question thus may be generally characterized as a "drill or pay" type of a "modern" short definite term lease with a "thereafter clause" that preserves the lease for an indefinite secondary term based on a number of various potential operations that the parties contemplated could occur on the premises. The lease does not contain a forfeiture clause, but does contain a provision permitting a complete or proportional surrender.

At some point during the initial ten years of the lease defendant utilized the property for the storage of "non-native" gas, that is gas produced from other property not pooled or utilized with the property. Shortly before the expiration of the ten year term, defendant sent written notice to plaintiffs' predecessor indicating it was utilizing the property for the storage of gas as part of the South Bend Natural Gas Reservoir. Defendant has stored non-native natural gas at the hundred foot sand formation since that time and has tendered payment for storage privileges at the set annual rate of one dollar per acre during all relevant times.

No oil or gas wells have ever been drilled on the property by defendant or any of its predecessors. Defendant has never submitted an application for a drilling permit for the property. The property has never been pooled or utilized with adjacent property for the purpose of production. Defendant ceased its drilling business many years ago and has not drilled any wells in over fifteen years. Defendant no longer owns any drilling rigs or equipment.

Information available to the parties has led to the belief that the property contains valuable deposits of natural gas at formations substantially below the hundred foot sands. Defendant has acknowledged that the natural gas bearing sand formations below the hundred foot sands are likely to contain commercially productive deposits of natural gas. Defendant also has acknowledged that the subsurface gas formations below the hundred foot sands are divisible from it, both conceptually and from an engineering perspective. Defendant concedes that as long as it is able to reserve its exclusive rights to store gas at the hundred foot sands, the deeper gas formations can be "severed" from that portion of the property. Defendant periodically authorizes operators to drill through gas storage zones in order to reach deeper horizons for the production of oil and gas, provided that safety features are observed and defendant's storage of gas is not compromised. The Pennsylvania Department of Environmental Protection will issue permits authorizing the drilling of oil and gas wells through gas storage zones pursuant to various regulations pertaining to such operations.

Defendant has not paid any delay rentals specifically designated for the purpose of preserving the production rights granted in the lease after the expiration of its primary ten year term on June 15, 1966. No royalties have ever been paid under the lease due to defendant's election not to explore or drill for oil or gas. No production wells have ever been established on the property.

After acquiring the property plaintiffs made a written demand on February 8, 1995, requesting defendant either drill and develop the property for the production of

oil and gas or surrender its claim to the sub-surface gas formations below the hundred foot sand formation. Defendant refused to accede to either aspect of plaintiff's demand, but did offer to "sell" the drilling rights under the lease to plaintiffs. After receiving defendant's refusal and offer to sell, plaintiffs notified defendant in writing that they were treating the lease as terminated.

On March 21, 1995, plaintiffs granted an oil and gas lease to Penneco Energy Corporation, which is a family-owned business. Penneco Energy is prepared to explore the property for the production of gas and to produce a series of wells if the results from an initial test well are favorable.

The parties' dispute has centered around plaintiffs' contentions that the production and storage provisions of the lease are contractually severable and that defendant has failed to comply with an implied covenant to develop the property for production. Following discovery defendant moved for partial summary judgment on several counts in plaintiffs' complaint. Defendant attacked plaintiffs' theory that the lease constitutes "a severable contract" as untenable under Pennsylvania law, arguing the cases referenced by plaintiffs consistently held that a contract cannot be found to be "severable" unless it is ambiguous on its face. Defendant further countered plaintiffs' theories of recovery by arguing that (1) Pennsylvania law did not recognize an implied covenant of development and production in an oil and gas lease under the circumstances, (2) there had been no forfeiture of rights under the lease, (3) the lease was not unconscionable and (4) plaintiffs had failed to produce sufficient evidence to support their disparagement of title claim.[4]

On September 22, 1997, the Honorable D. Brooks Smith, then United States District Judge for this Court, authored a "memorandum order" concluding that "the clear language of the Lease" precludes any contention that its provisions are severable and "the language of the Lease does not cabin the rights to production and storage into separate and distinct categories." Memorandum Order of September 22, 1997 (Doc. No. 31) ("Memorandum Order") at p. 12. Reasoning that defendant has the option to exercise its rights to produce or store either together, alone, or not at all, and the consideration defendant is to pay for such activities is dependent upon defendant's election of one or more of the options, Judge Smith further concluded that "the consideration is not strictly apportioned to production and storage [and] without the apportionment of the consideration to be paid, the Lease cannot be deemed to be severable." *Id.* at 13 (citations omitted).

Judge Smith also found that the clear language of the contract negated plaintiffs' assertion that the lease was to be read as containing an implied covenant to develop and produce oil and gas. He reasoned the lessee was given the right not to develop and produce oil and gas, provided it tendered payment in the form of delay rentals or elected to store gas on the premises. Memorandum Opinion at 15. He opined: "[t]he delay rental or the payment for the storage privileges serve[s] to compensate the lessor for the encumbrance upon his property." *Id.* at 15.

Based on the two holdings summarized above, Judge Smith concluded:

> Consistent with my conclusions that the Lease remains in effect, that it en-

---

4. It appears that plaintiffs' unconscionability and disparagement claims are no longer at issue in this litigation.

compasses the right to production and does not include an implied right to develop and produce the oil and gas thereunder, the [plaintiffs'] assertions that the Lease should be terminated due to [defendant's] failure to drill and develop the leased premises for the production of oil and gas are not persuasive. Accordingly, Counts II through VII fail as a matter of law and summary judgment will be entered in defendant's favor.

Memorandum Order at 15. The remaining counts of the complaint were resolved pursuant to defendant's motion for partial summary judgment or by agreement of the parties, and plaintiff filed a timely notice of appeal to the United States Court of Appeals for the Third Circuit.

Pursuant to plaintiffs' appeal, the Third Circuit certified the following questions to the Supreme Court of Pennsylvania:

Is a finding that the contract is ambiguous a prerequisite to applying the doctrine of severability announced by the Pennsylvania Supreme Court in *Heilwood Fuel Company, Inc. v. Manor Real Estate Co.*, [405 Pa. 319,] 175 A.2d 880 (Pa.1961)?

Does Pennsylvania recognize an implied covenant to develop and produce oil and natural gas that would impose upon a lessee the obligation to produce oil and gas from the leased property?

The Supreme Court of Pennsylvania ("Supreme Court") accepted the certified questions and authored an opinion in response, which appears at *Jacobs v. CNG Transmission Corp.*, 565 Pa. 228, 772 A.2d 445 (2001). After considering the Supreme Court's answers to the certified questions, the Third Circuit reversed the entry of summary judgment in this court "and remanded with directions to reconsider summary judgment in light of the Supreme Court of Pennsylvania's answers to our certified questions." Judgment Order of December 26, 2001 (Doc. No. 45), at 2.

In a memorandum issued in conjunction with the order of judgment, the Third Circuit summarized the Supreme Court's analysis of when a contract is "severable," as opposed to "entire," and directed this court to revisit the issue—"paying particular attention to the issues we certified to the Supreme Court, and its answers." Non-precedential Memorandum Opinion of December 26, 2001 (Doc. No. 45), at 4. With regard to the issues surrounding any implied covenant to develop and produce oil and gas under Pennsylvania law, the Third Circuit observed that the Supreme Court drew a distinction between instruments where the compensation to the lessor is a royalty payment resulting from the extraction of the underground resource and an instrument whereby the lessor receives compensation if the lessee does not actively extract the resource, with an implied covenant to develop being recognized where the consideration received is dependent on production. *Id.* at 4. The court further noted that the Supreme Court indicated that "what constitutes adequate compensation for this purpose obviously must be determined by taking into consideration the facts and circumstances of each individual case." *Id.* at 4 (*quoting Jacobs*, 772 A.2d at 455 n. 5). The Third Circuit then further directed:

In reconsidering its summary judgment, the District Court must decide what, under the facts of this case, constitutes 'adequate consideration,' and whether, according to the Supreme Court, 'the lessee [ ] has an affirmative obligation either to develop and produce the oil and gas or terminate the landowner's contractual obligations.'

*Id.* at 4 (*quoting Jacobs*, 772 A.2d at 455.).

Following remand to this court plaintiffs sought leave to conduct further discovery

based on the pronouncements of the Supreme Court. *See* Document No. 46. Defendant opposed the motion on the ground that "it is highly improbable that discoverable evidence by way of testimony, documents and other items exists beyond what has already been made available to date." Defendant's Response (Doc. No. 47) at 1. Judge Smith held a status conference on April 25, 2002, and thereafter denied plaintiff's motion without prejudice to refile it with an accompanying brief identifying "in detail what specific and limited areas of additional discovery the plaintiff[s] seek [ ]." Order of April 25, 2002 (Doc. No. 49). Plaintiffs filed an amended motion in compliance with the April 25, 2002, order. Through these requests plaintiffs sought to determine whether any ascertainable facts might be developed concerning the signing of the lease, the parties' conduct subsequent to the execution of the agreement and whether the intent of the parties was to permit the storage of gas alone without the requirement that any productive oil and gas reserves be developed. Plaintiffs' Brief in Support of Amended Motion for Leave to Conduct Further Discovery (Doc. No. 52) at 2–3. Defendant opposed plaintiff's amended motion on several grounds and asserted this court had already undertaken the precise analysis required by the Supreme Court's decision. Defendant's Brief in Response (Doc. No. 53) at 2–3. On August 8, 2002, Judge Smith denied plaintiffs' amended motion to conduct further discovery and directed the parties to file the now-pending cross-motions for summary judgment. On October 9, 2002, this case was reassigned to this member of the court for all further proceedings.[5]

Notwithstanding the protracted development of the case before two separate appellate tribunals, the parties continue to advance essentially the same legal arguments. Plaintiffs maintain that close and careful scrutiny of the lease in accordance with the principles expounded by the Supreme Court demonstrate that the contract is severable as to production and storage rights. They further assert that because the record unequivocally demonstrates that defendant did not perfect its rights to production during the primary term of the lease and/or failed to conduct exploration of the property to ascertain whether it contains commercially lucrative deposits of oil or gas for an inordinate number of years, defendant either breached an implied covenant to develop and produce oil and gas or abandoned its interests to do so.

Defendant maintains that the explicit language of the lease sufficiently undermines plaintiffs' contentions and, when viewed in conjunction with the Supreme Court's opinion, supports Judge Smith's prior analysis. Defendant specifically argues that because the lease gave defendant the right to elect not to develop and produce oil and gas and further indicated that payments for delay or storage rentals were expressly designated as adequate compensation for the incumbrance on the property; the lease does not obligate it to both produce and store, but instead gives it an indivisible right to do either, and the election to do one is binding with regard to both rights. Defendant thus maintains that Judge Smith's prior analysis "stands four square" with the analysis required on remand, "the facts have not changed since that decision" and the Supreme Court's clarification of the law only serves to reinforce the original decision granting summary judgment in defendant's favor.

---

5. In light of defendant's response to plaintiffs' motion for additional discovery, the court will treat the evidentiary record as complete and conclude that it cannot be meaningfully supplemented as to the historical facts underlying the parties' dispute.

Memorandum of Defendant in Support of its Renewed Motion for Summary Judgment (Doc. No. 59) at 18.

Pursuant to the Third Circuit's order of remand, this court is obligated to consider anew whether the lease is an entire or severable contract, whether "adequate consideration" was given under the lease to maintain a potentially perpetual vested interest in all production rights without having to develop the leaseholder for production, and, in light of these determinations, resolve the parties' dispute concerning their respective rights under the lease. These inquiries require the court to take into account a number of background principles.

■■■ In the first instance, "[a] lease is in the nature of a contract and is controlled by principles of contract law." *J.K. Willison, Jr. v. Consolidation Coal Co.*, 536 Pa. 49, 637 A.2d 979, 982 (1994) (*citing Amoco Oil Co. v. Snyder*, 505 Pa. 214, 478 A.2d 795, 797 (1984)). And on this level an agreement embodied in a lease is to be construed in accordance with the terms manifestly expressed therein. *Id.* In this regard "[i]t is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and if the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982); *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 n. 5 (1986). Consistent with this principle it is the accepted and plain meaning of the language used by the parties that controls the construction to be given to the agreement. *J.K. Willison, Jr.*, 637 A.2d at 982.

■■■ But where an ambiguity exists in a written contract, the court may resort to extrinsic or collateral circumstances to resolve that ambiguity, "irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Hutchison*, 519 A.2d at 390. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Id.* (*citing Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1, 5 (1984)). It is the court's obligation to determine whether an ambiguity exists, whereas the finder of fact resolves conflicts in parole or extrinsic evidence submitted to resolve a dispute. *Id.*

■■■ Of equal importance is the well understood recognition that the execution an oil and gas lease reflects a conveyance of property rights within a highly technical and well-developed industry, and thus certain aspects of property law as refined by and utilized within the industry are necessarily brought into play. *Daset Mining Corp.*, 473 A.2d at 592. *Hutchison*, 519 A.2d at 387 n. 1 (using the term "lease" with regard to the conveyance of mineral rights "is in some respects a misnomer [because] [w]hat is really involved is a transfer of an interest in real estate, the mineral in place."). The Supreme Court has aptly observed that "[t]he traditional oil and gas 'lease' is far from the simplest of property concepts." *Brown v. Haight*, 435 Pa. 12, 255 A.2d 508, 510 (1969). In the context of oil and gas leases, the title conveyed is inchoate and initially for the purpose of exploration and development. *Calhoon v. Neely*, 201 Pa. 97, 50 A. 967, 968 (1902); *accord Burgan v. South Penn Oil Co.*, 243 Pa. 128, 89 A. 823, 826 (1914) ("The title is inchoate, and for purposes of exploration only until oil is found."). If development during the primary term is unsuccessful, no estate vests in the lessee. *Id.* If oil or gas is produced, the right to produce becomes vested and the lessee has a property right to extract the oil or gas.

*Calhoon,* 50 A. at 968; *Barnsdall v. Bradford Gas. Co.,* 225 Pa. 338, 74 A. 207, 208 (1909) (an oil and gas lease that results in production "creates a corporeal interest in the lessee in the demised premises, and is not merely a license to enter and operate for oil and gas."). In such circumstances the lessee will be protected in accordance with the terms of the lease and will be required to operate the leasehold for the benefit of both parties. *Venture Oil Co.,* 25 A. at 734; *Calhoon,* 50 A. at 968; *Burgan,* 89 A. at 826.

 Over the years leases that result in production generally have been characterized as transferring a fee interest in the oil and gas, but the extent of the fee interest has been the subject of much debate. While coal leases are generally understood to convey a fee simple in the coal subject to a right of re-entry, "oil and gas leases are traditionally interpreted differently because of the varied physical characteristics of the minerals involved." *Brown,* 255 A.2d at 512. When production is obtained under an oil and gas lease the habendum clause creates a fee simple determinable in the lessee. *Id.* A fee simple determinable is an estate in fee that automatically reverts to the grantor upon an the occurrence of a special event. *Id.* at 511. The interest held by the grantor after such a conveyance is termed "a possibility of reverter." *Higbee Corporation v. Kennedy,* 286 Pa.Super. 101, 428 A.2d 592,

595 (1981) ("words of indubitable limitation, such as 'so long as,' 'during,' 'while' and 'until,' are generally used to create the fee simple determinable."). *(citing Henderson v. Hunter,* 59 Pa. 335 (1868)). Such a fee is a fee simple, because it may last forever in the grantee and his heirs and assigns, "the duration depending on the concurrence of collateral circumstances' which qualify and debase the purity of the grant." *Id.* at 595 n. 4 *(citing 2 Blackstone Commentaries,* 109 and *Slegel v. Lauer,* 148 Pa. 236, 23 A. 996, 997 (1892)). The principal distinction between a fee simple determinable and a fee simple subject to a condition subsequent is that a condition subsequent vests in the grantor a right of re-entry, which must be perfected following the occurrence of the condition. *Id.* (citations omitted). In contrast, a reverter vests automatically in the grantor upon the occurrence of the collateral circumstances following the indubitable limitation. *Id.*

 In light of the speculative nature of the property conveyed by an oil and gas lease and the traditional understanding that lessees are far better accustomed to dealing with such property, it is appropriate to construe any ambiguity in such instruments in favor of the lessor. *Posini v. T.W. Phillips Gas and Oil Co.,* 397 Pa.Super. 564, 580 A.2d 776, 778 (1990).[6] Oil and gas leases are executed

---

**6.** The early development of oil and gas leases was influenced by certain beliefs about the economic and physical facts concerning oil and gas, and "the courts, particularly in the early cases, labored under misapprehension and in actual ignorance" as to these facts. 1 Summers, THE LAW OF OIL AND GAS § 1. Both substances were believed to be volatile and easily susceptible to migration. *Id.* at § 4. They were characterized as "fugitive" and being capable of "drainage" onto neighboring lands. *Id.* It was also recognized that to be useful the substances had to be extracted from the earth and their production and uti-

lization should not be wasteful. *Id.* at § 5. These early understandings had a marked influence on how the parties crafted their contracts and how the courts interpreted those agreements. *Id.* at § 371. They also led to the development of certain rules of interpretation that were believed to serve the public and private interests implicated by the development of the industry, one of which was the rule that such leases were to be interpreted in favor of the lessor and against the lessee. *Id.* at §§ 371 & 372. The application of this rule as well as a number of others founded upon

for a discrete and well understood purpose and the severance of mineral rights is to be narrowly construed in light of these circumstances. *Pomposini*, 580 A.2d at 778. And given the nature of the property conveyed and the limited purpose for the conveyance, "[a]ll rights claimed by the lessee that are not conferred in direct terms or by fair implication ...are to be considered as being withheld by the lessor." *Id.* (*quoting* 38 Am. Jr.2d, Oil and Gas § 94 (1968) and *citing Ray v. Western Pa. Natural Gas Co.*, 138 Pa. 576, 20 A. 1065 (1891)); *see also Babb*, 687 A.2d at 1121–22 (opportunity to remediate for failure to attain production as contemplated by lease was not within rights conveyed by expressed terms of the lease and therefore could not be asserted to avoid default).

▆▆▆ Where the words of a deed are ambiguous, then all attending circumstances existing at the time of execution must be considered in determining the apparent object of the parties. *Stewart*, 266 A.2d at 263; *see also Burns Manufacturing Co. v. Boehm*, 467 Pa. 307, 356 A.2d 763, 766 n. 3 (1976) (Where a document is found to be ambiguous, inquiry is to be made into the circumstances surrounding its execution in an effort to clarify the meaning the parties sought to express by the language they chose)(*citing New Charter Coal Co. v. McKee*, 411 Pa. 307, 191 A.2d 830 (1963)). Only when this inquiry fails to clarify the ambiguity should the court resort to the rule of construction interpreting leases and grants most strongly against the drafter. *Burns Manufacturing Co.*, 356 A.2d at 766 n. 3 If the parties have not expressly addressed a matter with particularity in the lease, then the intent of the parties must be inferred. *Stewart*, 266 A.2d at 263. And "where the

language of the contract is contradictory, obscure or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Id.* (*quoting Wilkes–Barre Twp. School District v. Corgan*, 403 Pa. 383, 170 A.2d 97, 98 (1961)).

▆▆▆ Although the rules of construction noted above are valuable aids of interpretation, they are not to be applied in a manner that creates a contract beyond the parties' intent. *Stewart*, 266 A.2d at 264; *Hutchison*, 519 A.2d at 388 ("the law will not imply a different contract than that which the parties have expressly adopted") and 390 n. 5 (rules of construction are not be applied as a substitute for ascertaining the intention of the parties). With these background facts, procedural developments and general principles in mind, we turn to the parties' fundamental disputes.

### THE SEVERABILITY/ENTIRETY ISSUE

▆▆▆ Plaintiffs strenuously pursue a determination of severability in their quest for relief. This traditional legal doctrine of contract law recognizes that where the parties have intentionally apportioned the "consideration on either side [of a contract] to correspond to the unascertained consideration on the other side," a divisible contract was within the objects of the parties. *Producers' Coke Co. v. Hillman*, 243 Pa. 313, 90 A. 144, 145–46 (1914). The general approach to be employed in ana-

---

these initial beliefs continues to be reflected in the contemporary case law. *See e.g. Pomposini*, 580 A.2d at 778; *accord Babb v. Clem-* ensen, 455 Pa.Super. 181, 687 A.2d 1120, 1122–23 (1996).

lyzing whether an agreement is "entire" or "severable" is straightforward but at times difficult to apply. The *Jacobs* court reiterated:

It is often most difficult to determine whether a contract is entire or severable. The primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract be considered entire or severable (*Easton v. Jones*, 193 Pa. 147, 44 A. 264 [(1899)]); only in the absence of a clear indication of the parties' intention from the language of the contract may resort be had to rules of construction (*Producers' Coke v. Hillman*, 243 Pa. 313, 90 A. 144 [(1914)]).

*Jacobs*, 772 A.2d at 450 (*quoting Heilwood*, 175 A.2d at 884). Thus, the inquiry is focused exclusively on ascertaining the parties' intent.

The character of the consideration exchanged between the parties may in itself determine the severability of a contract. *Heilwood*, 175 A.2d at 884. It has been held that if the consideration cannot be apportioned, then the contract is entire as a matter of law. *Canister Co. v. Wood & Selick*, 73 F.2d at 312, 313 (3d Cir.1934); *Lucesco Oil Co. v. Brewer*, 66 Pa. 351 (1870). The apportionment of consideration to distinct and separate components of an agreement is in general an indication that the parties intended to create an agreement with severable provisions. *Shields v. Hoffman*, 416 Pa. 48, 204 A.2d 436, 438 (1964).[7] In contrast, the divisibility of the subject(s) of the contract is not controlling. *Id.* For example, an agreement calling for installment payments in correlation to the specific stages of building a house will not render a contract to build the entire home divisible. *Producers' Coke Co.*, 90 A. at 145–46 (*citing* Story on Contracts, § 24).[8]

7. The *Jacobs* court emphasized that under Pennsylvania law these rules have been developed as a rule of contract construction:

With respect to the last point, the [*Heilwood*] Court referred to a "rule of construction" recognizing that "the character of the consideration may determine the severability of the contract." "If the consideration is single, the contract is entire ... whatever the number or variety of items embraced ... but, if the consideration is apportioned, either expressly or by necessary implication ... the contract will generally be held to be severable..."

*Jacobs*, 772 A.2d at 451 (*quoting Heilwood*, 175 A.2d at 884–85). It also made clear that "there is [no] hard and fast rule in Pennsylvania that a court must find that a contract is ambiguous as to entirety/severability before the court may apply rules of contract construction to ascertain the parties' intent." *Id.* at 451. The law "is not so rigid." *Id.*

8. The Supreme Court has applied these general rules and found that a contract was severable on two occasions. In *Heilwood*, the court passed on an agreement that obligated the parties to exchange deeds to certain parcels of land and then to enter into lease provisions governing the mining and shipment of coal in order to obtain the payment of a state royalty. The trial court concluded that the contract revealed a clear intent to enter into an agreement that was entire. The Supreme Court disagreed, finding nothing in the language of the agreement indicated a clear intent to make the contract entire. Instead, the language of the agreement was ambiguous on the issue. Consequently, the *Heilwood* court took into account the events which took place, the subsequent conduct of the parties and the character of the consideration in holding that the contract was severable. *Heilwood*, 175 A.2d at 885.

In *Shields*, the Court applied *Heilwood* in the context of analyzing a partnership liquidation agreement covering the sale of assets by one partner to the other. In addition to the provisions governing the sale, the agreement contained a restrictive covenant prohibiting the selling partner from conducting business during a period of time in exchange for monetary payments. Notwithstanding an expressed statement in the contract declaring that its provisions were severable, the *Shields* court

Where the parties have not directly addressed the issue of severability, merely identifying the consideration exchanged within the four corners of the written agreement is not sufficient. A much more searching inquiry is necessary. The *Jacobs* court reiterated that in such circumstances the court is to:

[L]ook at a contract as a whole, including the character of the consideration, ... [and] may also consider the circumstances surrounding the execution of the contract, the conduct of the parties and any other factor pertinent to ascertaining the parties' intent.

*Jacobs*, 772 A.2d at 452. Thus, in such circumstances the inquiry is much broader in scope.

 In sum, then, the central task in resolving the parties' dispute concerning the issue of severability "is to ascertain the intent of the parties." *Id.* at 452. "That intent may be apparent from the explicit language of the contract, or it may be obvious from a 'construction' of the agreement, including the nature of the consideration ...." *Id.* If the parties' intent is not clearly expressed, then resort to the common aids of construction is appropriate.

The lease does not contain an express provision indicating the agreement is to be construed as entire or severable. Accordingly, it is necessary to consider the lease as a whole, the character of the consideration, the circumstances surrounding the execution of the contract, the conduct of the parties and any other pertinent factor bearing on the parties' intent.

Defendant contends a review of the express provisions of the lease leads to the unmistakable conclusion that the parties intended the contract to be entire. Specifically, defendant emphasizes that the lease was entered for dual purposes: the production of oil and gas "and for the further purpose with the exclusive right in the lessee, as it may see fit to store any kind of gas therein ..." Lease at ¶ 1. Defendant interprets the lease as giving it the ability to extend the initial ten year period of the lease into the indefinite secondary term by (1) engaging in oil and gas production operations on the property; or (2) by doing so on other leased property pooled or utilized in conjunction therewith; or (3) by storing gas on the property. Defendant further asserts the lease gives it the unrestricted right to store gas even if production from the property or other lands utilized therewith ceases, and in such an event the lease purportedly remains in effect if the property is only used for the storage of gas. Defendant also notes that the lease provides for an annual storage rental that continues until the property is no longer used for that purpose, and this provision is only subject to a change in payment if the lessee stores gas in a well or wells developed on the property. Lease at ¶ 5. From defendant's perspective these various provisions in the lease demonstrate that the rights of production and storage are expressly intertwined in a manner that prohibits their division into separate and distinct categories. Defendant consequently argues the agreement is entire and the provisions governing the consideration flowing to the lessor cannot be read to reflect a contrary intent.

Plaintiffs argue that the parties intended to enter into two separate transactions:

analyzed the distinct aspects of the agreement to determine whether the intent of the parties as to severability was clear. The *Shields* court "did so even though there was no ambiguity." *Jacobs*, 772 A.2d at 451. It concluded that even if the parties had not indicated that the provisions of the contract were severable, the court would have concluded that they were "because the parties apportioned the consideration both as to subject matter and payment." *Jacobs*, 772 A.2d at 451 (*quoting Shields*, 204 A.2d at 438).

one involving "drilling and production rights" and the other "natural gas storage rights." Plaintiffs assert this "dual purpose" supports a determination of severability because (1) the parties expressly provided defendant with the ability to delay production during the primary term through the payment of delay rentals but did not provide for any similar consideration after the expiration of the primary term; (2) the ability to provide defendant with the option to forego development of the leasehold easily could have been accomplished by expressly providing defendant with the right to hold the drilling and production rights through the exercise of defendant's gas storage rights, but the parties failed to do so; (3) defendant's ability to exercise "utilization" and use "deep" natural gas zones with similar zones in adjacent property are examples of expressed means by which defendant could avail itself of various strata under the provisions of the lease and thus reflect an understanding that such subsurface strata are often distinct and divisible;[9] (4) defendant's conduct is inconsistent with a retention of the drilling and production rights initially conveyed; and (5) the consideration for gas storage rights and drilling and production rights are distinctly and separately allocated in the royalties section of the lease. From these general premises plaintiffs thus conclude that the two identified purposes are addressed in a manner that makes the contract severable.

The lease does not expressly indicate that it contains entire or severable provisions. Accordingly, resort to the pertinent aids of construction is appropriate.

■ After considering the various aids to construction, it is clear that the parties did not enter into an agreement designed to accomplish two separate and distinct undertakings. To the contrary, consideration of (1) the contract as a whole, (2) the division of consideration and (3) the circumstances surrounding the execution of the lease indicate the parties intended it to be entire.

Consideration of the contract as a whole leads to the conclusion that the parties intended it to be entire. Like a contract to build a house, the parties intended to enter into an agreement designed to develop the property to the fullest extent possible for the mutual benefit of both parties. Several aspects of the agreement evidence this intent.

The leasing clause indicates the agreement is for the basic purpose of drilling and operating for and producing oil and gas, with a corresponding and "further" purpose of permitting the lessee to store gas "of any kind" (i.e., native or non-native gas) in any substrata or horizon in and under the property. The rights to construct, maintain and place necessary operational equipment on the property and to make any necessary use of the surface are given for and limited to operating the property in furtherance of either or both purposes. The habendum clause grants an inchoate fee simple determinable that

---

9. For over a century Pennsylvania law has recognized that real property is divisible into different and distinct strata. The Supreme Court has observed:

> It often happens that the owner of a farm sells the land to one man, the iron or oil, or gas to another, giving to each purchaser a deed, or conveyance in fee simple for his particular deposit or stratum, while he re-

tains the surface for settlement and cultivation precisely as he held it before. The severance is complete for all legal and practical purposes. Each of the separate layers or strata becomes a subject of taxation, of encumbrance, levy and sale, precisely like the surface.

*Chartiers Block Coal Co. v. Mellon*, 152 Pa. 286, 25 A. 597, 598 (1893).

vests and continues as long as the lessee "operate[s] the premises in search for or production of oil and gas" or as long as gas is being stored or withdrawn from the premises. The cessation of production from wells on the property after the expiration of the original term does not terminate the right to store gas provided any substrata have been put to such use when the wells are plugged and abandoned. These provisions indicate the parties recognized that production and storage were interrelated components of developing the leasehold. Thus, the leasing clause and the habendum clause do not address separate and distinct contractual undertakings, but rather identify a single undertaking (i.e., the operation of the property) that may ripen into either or both specified purposes.

Moreover, the division of the lessee's duties of payment does not support plaintiffs' argument that the lease is to be construed as severable. The parties agreed that delay rental payments would be made from the commencement of the lease until either a well yielding a royalty to the lessor was drilled on the property or any sands under the property were utilized for the storage of gas. Under the delay rental provision, the parties agreed that the lessee could elect to drill or not drill on the property, and that the initial dollar paid and the delay rental would "constitute adequate compensation for such privilege." The delay rental payment thus provided initial compensation for the privilege of foregoing development of the leasehold. And attaining either purpose identified in the granting clause was intended to relieve the lessee from any further obligation to make delay rental payments. Again, these provisions of the lease reflect an intent to enter an agreement with the single objective of operating the premises in a manner

designed to achieve the fullest development of its dual purposes.

The lessee's obligation to pay royalties and for the right of storage privileges reflect the same intent. The payment of royalties is contingent on the progression and success of the lessee's operation of the premises. Once operations reach the point that the property is used for storage of native or non-native gas, the payment of storage privileges relieves the lessee of any further obligation to pay delay rental or royalty due for the right to produce oil or gas from the particular "sands, strata, or horizons where gas may be stored...." This release of the obligation to pay delay rental or royalty for the specific substrata utilized remains in place until wells on the leased premises are utilized for the storage of gas, in which event" the lessee becomes obligated to pay for storage rights pursuant to a per well formula. The parties contemplated that the payment for storage privileges would be credited toward any storage payment or royalty due after a well was developed on the property to the extent the storage rental payment overlapped with any payment due from operating a well for either storage or production. Thus, once again, the parties viewed the lease as an agreement to operate the premises in a manner designed to maximize the dual purposes of the lease.

The construction of the lease as effectuating an agreement to operate the premises in a manner designed to perfect the dual purposes of the lease to the fullest extent possible for the mutual benefit of both parties is further supported by the prevalent understanding in the industry at the time the lease was executed. When the lease was executed in 1956 the courts had adopted a central and unified understanding concerning the approach to be used in interpreting the particular sections

of an oil and gas lease.[10] This central understanding further demonstrates that the lease was intended to be an agreement that is entire.

When the lease was executed it was well-understood under Pennsylvania law that the standard oil and gas lease containing various royalty provisions would be interpreted as containing a covenant to develop the property in a proper manner and with reasonable diligence regardless of whether such an obligation was expressed in the instrument. *Burgan*, 89 A. at 825 ("the presumption is that a lease is made for the purpose of immediate development, unless the contrary appears in the contract of the parties.").[11] The implied covenant to develop the leasehold for mineral production with due diligence and for the mutual benefit of both parties grew out of "the public interest which is concerned with the development of the natural re-sources of the state." *Hummel*, 150 A.2d at 861.[12]

This construction was reflected in the early cases such as *Ray v. Western Pennsylvania Natural Gas Co.*, 138 Pa. 576, 20 A. 1065 (1891), where the court held that a lessor could sue for unpaid rent notwithstanding the lessee's claim that his own default in developing the property created a forfeiture of the lease and provided the lessor with a complete remedy. *Id.* at 1066. The court opined:

No case has been brought to our attention in which the lessee was allowed to take advantage of his own wrong, or to set up his own default, to work a forfeiture of his own contract.... persons may perhaps contract expressly in this form, and to this effect. When they do, the transaction amounts to a mere option, and the lessee, in setting up his own default, simply avails himself of an

10. In construing an oil and gas lease, it is the intention of the parties at the time the agreement is executed that governs. *Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259, 263 (1970); *Jacobs*, 772 A.2d at 452–54.

11. The principle that it is proper to resort to established understandings within a specialized industry when interpreting written instruments peculiar to that industry applies with equal force to implied covenants and conditions commonly recognized within the industry. *See Hummel v. McFadden*, 395 Pa. 543, 150 A.2d 856, 862 (1959); *Hutchison*, 519 A.2d at 388–90 (mineral leases are to be construed as containing implied covenants commonly recognized by the courts unless the parties have specifically addressed the matter through the terms of their agreement). Thus, the interpretations and practices commonly recognized within the oil and gas industry in the 1950's provide insight into the meanings associated with the language the parties chose to employ in the lease. Commonly recognized interpretations and practices within the industry in the 1950's are referenced and discussed in detail in the permanent edition of W.L. Summers' multi-volume treatise titled THE LAW OF OIL AND GAS, the volumes of which were copyrighted at various times in the 1950's.

12. As previously noted, the consistent recognition of this doctrine and concomitant public policy considerations underlying it led to the use of delay rental payments to provide the lessee with the option of postponing immediate development of the leasehold during the primary term. *Supra* at n. 3. Against this backdrop the Pennsylvania courts recognized that the addition of delay rental merely provided a form of rent or damages during the fixed term of the lease, and thus such a provision postpones but does not eliminate the basic obligation to develop the property under an oil and gas lease for the mutual benefit of both parties. *See Marshall v. Forest Oil Co.*, 198 Pa. 83, 47 A. 927 (1901) ("there was no absolute covenant on the part of the lessee to develop the land. His agreement was he would commence operations within a specified period, or thereafter pay a certain fixed sum monthly as rental for the premises, which must be considered as damages to the lessor, liquidated by the parties to the lease, for the delinquency of the lessee in commencing his operations.").

elective right secured to him in his contract. We do not understand the contract in suit to be of this character. The clear purpose of the lessor was to have his land operated for oil and gas, and the condition was inserted for his benefit. While the obligation on the part of the lessee to operate is not expressed in so many words, it arises by necessary implication. The lease was for the expressed purpose of drilling and boring for oil and gas, the lessor, in a certain event, to receive a share of the productions as a royalty, or rent; and, in another event, to be paid $500 per annum for each gas-well, the production of which was conducted from the land for consumption. If a farm is leased for farming purposes, the lessee to deliver to the lessor a share of the crops, in the nature of rent, it would be absurd to say, because there was no expressed engagement to farm, that the lessee was under *no obligation to cultivate the land.* An engagement to farm in a proper manner, and to a reasonable extent, is necessarily implied. The clear purpose of the parties to this lease is to have the lands developed and the half-yearly payments and the other sums stipulated, were intended not only to spur the operator, but to compensate [the plaintiff] for the operator's delay or default. The lessor's hands have been tied for two years. We do not know that he lost anything in royalties, or that he suffered by drainage, for the territory might have proved unproductive; but, as the transaction was founded in the hope that either oil or gas, or both, might be found in paying quantities, it was competent for the parties to contract in advance for the amount of compensation to which, in the event of delay or default in development, the lessor would be entitled.

*Id.* at 1066–67. This view was reiterated in *Hill v. Joy,* 149 Pa. 243, 24 A. 293 (1892), where the court opined:

It is doubtless true that where a right to mine iron ore or other minerals is granted in consideration of the reservation of a certain portion of the product to the grantor, the law implies a covenant on the part of the grantee to work the mine in a proper manner and with reasonable diligence, so that the grantor may receive the compensation or income which both parties must have had in contemplation when the agreement was entered into.... this is an inference drawn from the manifest purpose of such a contract, and from the fact that the opposite conclusion would deprive the grantor of the consideration of his grant. It cannot be said to be a distinct contract, embraced in the same instrument with the one expressed. It is implied only because it is evidently a part of the contract expressed. The relation between it and the expressed covenant to pay a portion of the mineral produced is not similar to that between separate installments, successively falling due, under the same instrument. The implied covenant is rather a continuing, inseparable part of the expressed one, which it directly affects through the term of the grant. The relationship between them is that between good faith and all executory contracts.

*Id.* Thus, the implied covenant to develop and operate the leasehold for the mutual benefit of both parties was firmly entrenched in Pennsylvania law when the original lease was executed in 1907.[13]

---

**13.** The implied covenant to develop and operate a gas and oil leasehold for the mutual benefit of both parties is another rule of interpretation that was founded on the initial beliefs concerning the economic and physical facts pertaining to oil and gas and the public

And the Pennsylvania courts have continued to recognize this firmly entrenched doctrine in royalty-based leases unless the specific agreement of the parties precludes its application. *Jacobs*, 772 A.2d at 455. Thus, the understanding that royalty-based mineral leases would be construed in a manner designed to promote the full and diligent development of the leasehold for the mutual benefit of both parties was settled under Pennsylvania law when the lease was executed in 1956.

Moreover, construction of the provisions an oil and gas lease in a manner designed to promote the basic objective of full development of the leasehold for the mutual benefit of both parties was the prevalent view commonly adopted throughout the industry in the years preceding the execution of the lease. In considering whether the term "produced" as used in a habendum clause should be understood as meaning production in "paying quantities," the Supreme Court of Texas summarized the "modern" construction of oil and gas leases:

In order to understand and properly interpret the language used by the parties we must consider the objects and purposes intended to be accomplished by them in entering into the contract. The object of the contract was to secure development of the property for the mutual benefit of the parties. It was contemplated that this would be done during the primary period of the contract. So far as the lessees were concerned, the object in providing for a continuation of the lease for an indefinite time after the expiration of the primary term was to allow the lessees to reap the full fruits of the investments made by them in developing the property. Obviously, if the lease could no longer be operated at a profit, there were no fruits for them to reap. The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees. Since the lease was no longer yielding a profit to the lessees at the termination of the primary period, the object sought to be accomplished by the continuation thereof had ceased, and the lease had terminated.

*Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 512–13 (1942). This view likewise was summarized in 1959 by a prominent commentator in the industry, who explained its historical development as follows:

In tracing the development of the drilling clauses of the oil and gas lease in a previous chapter it has been pointed out that in the earlier cases the courts had no hesitancy in enforcing forfeitures of oil and gas leases where that power was expressly reserved. It will likewise be seen in later chapters that the courts have freely implied covenants to test and develop the land for oil and gas, protect it from drainage, and to market the product where such covenants may not have been expressly created in the lease; and they have allowed a recovery of damages for the breach of these covenants, terminated the leases where the covenants have become conditioned by the virtue of express forfeiture clauses, or damages seem an inadequate remedy, or have terminated them on the theory of abandonment.

The foundations of this policy of the courts were in the main, first, that it was the plain intent and motive of these leases that there should be a prompt devel-

and private interests believed to be implicated by the development of the industry. 2 Sum-

mers, THE LAW OF OIL AND GAS at §§ 371 & 372.

opment of the land and the payment of royalties, which were the only substantial consideration coming to the lessor for the inconvenience of having his land burdened by them; second, that because of the peculiar physical characteristics of oil and gas, and the likelihood of their escape from · the land by drainage or from natural migration, early development and protection was essential to secure to the lessor and lessee alike the benefits of the contract; third, that in the event of failure by the lessee to develop the land within a reasonable time, both public and private interests demanded judicial termination of · the lease to make possible the use and alienation of the land for oil and gas or for other purposes. On these foundations was erected by the courts what may be termed the policy of development. At the time of its origin and for many years thereafter its soundness could not be questioned. There was in these earlier days no problem of over-production with its resultant economic waste, nor had the courts become conscious of the fact that forced drilling and production might result in physical waste of these valuable minerals. It was through this formative period of oil and gas law when the policy of production was predominant, that certain so-called rules of construction of oil and gas leases were created. These rules have continued in the language of the decisions, although the policy upon which they were founded was greatly weakened by the counteracting policies, which may for convenience be termed the policy against over-production, or economic waste, and the policy of conservation of natural resources.

2 Summers, THE LAW OF OIL AND GAS § 371. The view that a oil and gas lease is to be construed as containing a unified purpose of developing the property for the mutual benefit of both parties continues to prevail in the more recent case law. *See Goodwin v. Wright*, 163 W.Va. 264, 255 S.E.2d 924 (1979) (relying on policy of development for the mutual benefit of both parties in concluding "that the use of free oil and gas for domestic purposes does not, in itself, constitute production that will keep a lease in effect after the basic term."); *Jacobs*, 772 A.2d at 454; *Clark v. Wright*, 311 Pa. 69, 166 A. 775, 776–77 (1933) (interpreting lease with rental provision in habendum clause as requiring construction calling for full development of the leasehold · for the mutual benefit of both parties); *Garcia*, 139 Tex. at 585–86, 164 S.W.2d at 512–13 (employing mutual benefit construction to uphold trial court's determination that lease had terminated); *see also* Russell L. Schetroma, *Basic Rights Acquired in the Oil and Gas Lease* (1991) *reprinted in* UNDERSTANDING COAL AND OIL & GAS LEASES AND ENVIRONMENTAL DUE DILIGENCE (Eastern Mineral Foundation, 1991).

As the above makes clear, when the lease was executed it was without question that the provisions of an oil and gas lease would be understood as forming an agreement with a central objective: promoting the development of the property for the mutual benefit of the parties. In light of this understanding, the dual purposes identified in the granting clause of the lease properly are understood as interrelated components designed to accomplish this central goal.

■■■ A renowned commentator in contract law has observed that "the essential feature of a divisible contract is that a portion of the price is set off against a portion of the performance." 15 Richard A. Lord, WILLISTON ON CONTRACTS § 45:7 (4th ed.2003). Pennsylvania law is in accord with this general observation. *Heilwood Fuel Co.*, 175 A.2d at 884; *Shields*, 204 A.2d at 438. In other words, a con-

tract generally is deemed to be severable only where the parties have made an apportionment of the consideration among the items embarrassed in its subject. *Keenan v. Larkin,* 194 Pa.Super. 436, 168 A.2d 640, 642 (1961); *Heilwood Fuel Co.,* 175 A.2d at 885. Here, unlike the "sharp division between the 'Exchange' provisions and the 'Lease' provision" in *Heilwood Fuel Co.,* and the "exchange" and "loan" provisions in *Keenan,* the lease in question had the single objective of developing the leasehold for all commercial uses associated with the production and sales of oil and gas and merely apportioned consideration according to the extent to which the operation of the leasehold was successful and ripened into attainment of the dual purposes expressed therein. The provisions of consideration under the lease are not distinctly allocated to the dual purposes identified in the leasing clause, but instead are drafted in such a manner that payment for one purpose interrelates to and impacts on the payment for the other. It follows that consideration of the lease as a whole and the provisions providing for consideration evidence an intent to enter an entire contract to develop the property for the mutual benefit of both parties to the extent it was commercially feasible to do so. This construction is in accord with the settled case law and the prevalent views in the industry at the time the lease was executed. Consequently, from a purely contractual point of view the lease is entire, not severable.

### The Implied Covenant to Develop and Produce Oil or Natural Gas

Plaintiffs alternatively contend that even if the contract is not severable, defendant and its predecessors had an obligation to develop the property in furtherance of the production of oil and gas at the expiration of the primary term and their failure to do so for an inordinate period of time has resulted in the loss of the production rights conveyed by the lease in all substrata distinct from the sands which defendant has utilized for gas storage. Plaintiffs specifically argue that the parties allocated compensation for defendant's election not to develop the property for production only for the "primary term," during which time the lessee could elect to postpone exploration of the property in exchange for the payment of delay rentals. In contrast, plaintiffs assert the parties never expressly agreed to a form of long-term compensation that would govern in the event the leasehold was not actively developed for the production of oil and gas at some point during the primary term, and defendant's conduct over the past twenty years demonstrates that it is holding the property and refusing to operate the leasehold for speculative purposes and in a manner inconsistent with the parties' mutual benefit. Plaintiffs thus argue that after the expiration of the primary term, defendant had an obligation to undertake exploration and reasonable development of the leasehold, and its prolonged failure to do so in the past thirty-eight years constitutes either a breach or surrender by abandonment of its production rights.

Defendant relies on the plain meaning of various phrases in the lease and contends that a review of those phrases "stand four square" with the analysis required on remand. Defendant specifically contends the parties explicitly agreed that (1) the lessee would not be obligated to develop and produce the oil and gas resources of the property and (2) the payment in the form of either delay rentals or storage rentals was and remains adequate to compensate the landowner for this right. Consequently, defendant asserts that the parties have expressly agreed to a formula for compensation where there is no active extraction of oil or gas, and as a result no

implied obligation to develop the property can be imposed on defendant.

Defendant misconstrues the proper focus of this court's inquiry. Our task is not to decide what meaning we might assign to the various provisions of the lease under the plain meaning doctrine based on a reading that does not account for the context in which the instrument was executed; it is our obligation to ascertain the meaning the parties ascribed to their agreement when they executed an instrument in 1956 containing components common to the developed and specialized mineral industry of oil and gas.

■■■■■■ In *Jacobs,* the court observed that its prior cases had "touched on [the issue of an implied covenant to develop and produce] intermittently for more than 100 years." *Jacobs,* 772 A.2d at 452. In general, an implied covenant to develop the leasehold appropriately exists where the compensation to the landowner is derived solely from royalty payments. *Id.* at 454. Where the parties have expressly provided compensation in the event that the lessee chooses not to develop the leasehold for production "during the term of the lease," then there is no implied obligation to develop and produce, provided the compensation is "adequate" based upon the facts and circumstances of the particular case. *Id.* at 455 (*quoting* and explaining *Hutchison,* 519 A.2d at 388–89). If the compensation is adequate and the lessee continues to pay for the right not to develop the leasehold, then there is no corresponding obligation on the lessee to actually drill wells. *Id.* But "[a]t the point where the compensation ceases due to the expiration of the term of the lease, or pursuant to the terms of the lease itself, the lessee has an affirmative obligation either to develop and produce the oil or gas or to terminate the landowner's contractual obligations." *Id.* That is to say, it

is a settled matter of public policy that "[t]he defendant cannot hold the premises and refuse to operate them." *Id.* (*quoting McKnight v. Manufacturers' Natural Gas Co.,* 146 Pa. 185, 23 A. 164, 166 (1892)).

The *Jacobs* court emphasized that the initial inquiry in this area is whether the provision permitting delay in development in exchange for liquidated damages has ceased to be operative due to the expiration of the term of *the lease.* A prominent commentator in the field recently has observed that the court's opinion in *Jacobs* raised a question about whether only the storage of non-native gas during the primary term (that is, without exploration and production) will constitute a sufficient activity to maintain an oil and gas lease into the indefinite secondary term. *See* 3 Williams and Meyers, OIL AND GAS LAW § 603.3(f). We conclude that it does not, at least as to production rights in all substrata separate and distinct from those being utilized for storage activities. A fair reading of the various provisions of the lease in conjunction with their settled meaning in the industry provides more than adequate support for this construction and the corresponding equitable relief which plaintiffs seek.

■■■ Plaintiffs argue that the delay rental provisions of the lease were intended to postpone defendant's obligation to develop the leasehold for production only during the primary term. As a result, an implied duty to develop the property for production arose at the conclusion of the primary term and defendant' long-term failure to comply with that duty has resulted in the expiration or surrender of all production rights not encompassed in and retained by defendant's storage of gas. In other words, defendant's election to pay delay rental during the entire ten year term and forego development of the property for production has resulted in the lack

of adequate consideration to hold the production rights indefinitely. The historical development in the industry leading to the use of such clauses and the expressed provisions of the lease support plaintiffs' construction.

As previously explained, delay rentals have long been used in the industry and have a settled meaning. It is customary for parties to an oil and gas lease to agree that a minimum advance royalty shall be paid for the lessee's right to forego immediate development of the leasehold for production. *Hutchison,* 519 A.2d at 388. Such advance minimum payments are in the nature of liquidate damages for the lessee's decision to forego production and are viewed as the consideration paid to the landowner in lieu of the royalty that would be paid if production operations were to be undertaken immediately. *Id.*

The clause in a modern oil and gas lease providing for such payment is known as "the drilling and rental clause, [and] is concerned with the requirements for maintaining the lease in effect during the primary term." 6 Williams and Meyers, OIL AND GAS LAW § 605. Traditional leases specify such obligations in a form that typically uses either an "or" or an "unless" in the operative provision of the clause. For example, in the "or" lease form, the drilling and rental clause obligates the lessee to do one of two or more acts, but provides the lessee with a choice of which such acts to perform. *Id.* The lessee may elect to perform by developing the land for production or may postpone production in exchange for the payment of a rental. *Id.* The lessee's option to forego the development of the property in exchange for payment commonly is expressed in the form of a "delay rental." *See Bertani v. Beck,* 330 Pa.Super. 248, 479 A.2d 534, 537 (1984). Under Pennsylvania law, when there is no expressed covenant or promise by the lessee to operate the lease, the drilling and rental clause does not create an obligation on the lessee to make monthly payments, but instead provides the lessee with an option through which he may extend the ability to search the property for appropriate development and avoid the abandonment or forfeiture of the production rights granted in the lease. *Id.* (quoting extensively from *Glasgow v. Chartiers Oil Co.,* 152 Pa. 48, 25 A. 232 (1892)).[14]

**14.** In *Glasgow,* the court construed a royalty/delay rental clause making the agreement void "unless" a well was drilled or rental paid as follows:

There is no express covenant, promise or undertaking by the lessee to be found anywhere in the agreement. A covenant to operate within a reasonable time might be implied from the nature of the instrument, but the lessee has been careful to make no express promise to operate the lease, or to do anything towards the development of the land. If he does nothing, the penalty for his inaction is fixed. It is the forfeiture or loss of his rights under the agreement. But if he thinks it an object to do so, he may prevent the assertion of this forfeiture by paying one hundred dollars in advance the first day of the next month after the date of the contract, and, upon such payment, *the right of forfeiture is postponed one month.*

This he may do month after month as long as he pleases, or until the end of five years. If, however, he puts down no well during the first month, and pays no money in lieu of it, *his rights are at an end, and the lessor may assert the forfeiture.*

[The legal effect of the term] is to confer on the [lessee] the right to explore for oil on the track described. If he does not exercise this right within [the specified time], it is lost to him, unless he chooses to pay $100.00 in advance as the price of another month's opportunity to explore. If he does exercise it, and finds nothing, he is under no obligation to continue his explorations. If he explores and finds oil or gas, the relation of landlord and tenant or vendor and vendee is established, and the tenant would be under an implied obligation to operate for the common good of both parties, and pay the rentor royalty reserved.

Here, the lessee agreed to develop the property during the first three months after the execution of the lease or pay a rental every three months thereafter commencing on June 16, 1956, and continuing "until" a well producing royalties was drilled or sands under the property were used for storage. Lease at ¶ 5. The payment of the delay rental provides the lessee with the option to "drill or not drill on the leased premises." *Id.* Thus, like the traditional drill and rental clauses, the drilling clause in question does not expressly obligate the lessee to take specific action in developing the leasehold. In-stead, the lessee's only obligation is to pay a delay rental to postpone the implied covenant of development. Such clauses obligating the lessee to pay a rental or develop the leasehold are known as "drill or pay" clauses. 3 Williams and Meyers, OIL AND GAS LAW § 605.1. And such clauses are understood to be operative during primary term. *Id.; Bertani,* 479 A.2d at 537; 2 Summers, THE LAW OF OIL AND GAS §§ 334, 385 & 397.[15]

If the instant case merely presented a straightforward "drill or pay" clause, the preceding understanding within the indus-

---

In this case, he did nothing in the way of development, and, after the payment of $100.00 per month for the delay, for a short time, he ceased to pay. The [lessor] contends that, because [lessee] might pay under the terms of the contract, he may be compelled to pay. But payment was the means provided by the contract by which the exercise of the right of the lessor to assert a forfeiture could be postponed. If the lessee did not wish to postpone the exercise of such right, he had only to refrain from making the payment.....

*Id.* The ability to postpone exploration and development of the property through the payment of a delay rental was construed to be limited to the five year primary term of the lease. *Id.*

In *Bertani*, the court construed a delay rental clause from a modern lease as similarly vesting in the lessee the option to pay a delay rental or forfeit the right to develop the leasehold. There, the delay rental was due annually during the primary term and the effect of each annual payment was to "extend for twelve months the time within which drilling operations or mining operations may be commenced." *Id.* at 535. (*quoting* the drilling and rental clause of the lease in question). Thus, from the early cases through contemporary times the courts have interpreted delay rentals to be limited to the initial term of the lease.

**15.** This understanding developed as a result of the industry's search for an appropriate means to limit the ultimate duration of an oil and gas lease. After the straight term lease proved unsatisfactory due to its tendency to place the lessee at a great disadvantage if production was achieved near the end or continued beyond the expiration date, initial experimentation resulted in the shortening of the definite term, the introduction of what came to be known as the "unless" drilling clause with an obligation to pay for the right to delay production through the payment of a delay rental and the introduction of a surrender clause (which gave the lessee the ability to end his obligations on property that proved to be unproductive prior to the expiration of the definite term). 2 Summers, THE LAW OF OIL AND GAS § 289. Lessees then sought to craft a lease "whereby the lessee could extend the period of exploration as long as he considered it worth while to pay a delay rental thereon." *Id.* This was attempted by using a habendum clause that simply conveyed the premises "on the following conditions . . .", one of which was the payment of a rental. This form became known as the "no term lease." *Id.* But the attempt to use this sort of lease was short-lived due to the intervention of the courts. *Id.* "One line of decisions held that, because the lease did not fix a time beyond which the lessee could not delay actual development and the payment of royalties, the alleged consideration for the lease, it was unenforceable against the lessor because of unfairness." *Id.* The other line of case "read into [the no term lease] an implied condition to the effect that the lessee could not indefinitely postpone development by payment of delay rentals, but was under a duty to drill upon the premises within a reasonable time, and if he failed to do so the lessor could, on proper notice, forfeit the lease for breach of the condition." *Id.*

try would answer the question before the court. But the lease in question expressly provides that defendant's right to operate the lease is to be undertaken in a manner calculated to achieve two purposes: "for the purpose of drilling and operating for and producing oil and gas, and for the further purpose and with the exclusive right of the lessee, as it may see fit to store any kind of gas therein ... and the right to remove the same ...." Lease at ¶ 1. The lease is to remain in force for the term of ten years, and as long thereafter as the property "is operated by the lessee in the search for or production of oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises by the lessee." The habendum clause thus indicates that the parties did contemplate that the lease would extend into the secondary term if all or a portion of the property was used for storing gas; and defendant utilized a portion of the property for the storage of gas during the primary term and has continued to do so. A reading of the lease based only on these isolated phrases and divorced from the context in which it was executed would support a construction that defendant has preserved all of its rights under the lease into the indefinite secondary term. But when read as a whole and in proper context, the provisions of the lease do not provide defendant with the option merely to elect to store non-native gas and through that activity alone indefinitely retain the production rights not affected by the storage. Several provisions of the lease demonstrate the accuracy of this construction.

First, the parties expressly addressed the effect of the "cessation of production of wells from the leased premises or other lands utilized therewith, after the expiration of the original term," and agreed that such cessation would not terminate the lease if the property was being used for the storage of gas prior to the plugging and abandonment of wells from which oil or gas had been produced. Lease at ¶ 3. In other words, the parties thus expressly provided for the protection and continuation of storage rights in the habendum clause in the event that production ceased during the secondary term of the lease. That protection is to be recognized if (1) the storage of gas had commenced at any time during the primary term of the lease and (2) that storage had occurred prior to "the plugging or abandonment of wells *from which oil and gas has been produced.*" *Id.* (emphasis added). Conversely, the parties omitted any expressed reservation of production rights based on the lessee's election to delay production activities during the entire primary term and utilize the property only for the storage of gas.

The failure to include a specific provision providing such a right in the habendum clause after expressly providing the same for storage rights following the cessation of producing wells is instructive. The inescapable inference is that storage was contemplated as being a consequence or aftermath of production on the property or production through utilization with adjacent property. A second inference is that what defendant preserved under the habendum clause when the election was made to only store gas was at best the right to continue with "the storage of gas." Lease at ¶ 3. Given that the parties carefully expressed when storage rights would be protected in the secondary term without the commonly related activity of production, this court is not free to incorporate implied rights that are counter to the first and most basic purpose of operating the lease for the mutual benefit of the parties and the public interest. *See Hutchison,* 519 A.2d at 388 ("The law will not imply a different contract than that

which the parties have expressly adopted."); *Stewart*, 266 A.2d at 264 (while the rules of construction in interpreting deeds "are valuable aids of interpretation, they ought not to be so liberally applied as to make a contract for the parties that they did not intend to make between themselves."); *Pomposini*, 580 A.2d at 778 ("all rights claimed by the lessee that are not conferred in direct terms or by fair implication ... are to be considered as being withheld by the lessor.").

Consideration of the delay rental and payment for storage privilege provisions in the lease is consistent with and further supports this construction. The "delay rental" provision obligates the lessee to pay a rental of $30.00 per quarter until the well is drilled or any sands of the leased property are utilized for the storage of gas. The parties agreed that the lessor would have the privilege of drilling or not drilling, and the consideration and rentals paid were understood to be adequate compensation for this privilege. But the compensation for the storage rights given to the lessee is only given "in lieu of all delay rentals or royalty due or to become due for the right to produce or for production of oil or gas *from the sands, strata or horizons where gas may be stored as herein provided* ...." Lease at ¶ 5 (payment for storage privileges) (emphasis added). Thus, while the annual per acre storage rental or the quarterly storage well rental/royalty is "in full compensation for the storage rights herein granted[,]" the payment for storage rights expressly relieves the lessee only from the obligation to pay delay rental or royalty for so much of the sands, strata, or horizons where gas is stored under the property. The parties therefore drew a distinction between the portions of the substrata encompassed by the lessee's storage activities and those that are not. In other words, the storage payment is not intended to provide adequate consideration for distinct substrata not utilized for storage or production at the end of the primary term. It follows that the lessee's obligations and rights with regard to the separate and distinct substrata not utilized for storage must be derived from the remaining provisions of the lease.

Defendant would have us read the lease as giving it an indefinite option on developing the property for production provided that at least a portion of the leasehold was used for storage during the primary term; and it is pressed upon us to recognize such a right notwithstanding defendant's election not to expend any effort toward developing the property for production at any time during the last forty-eight years. But that is not the agreement of the parties. Had the parties intended such an agreement, they could have easily provided that the annual storage rental or storage well rental/royalty is intended to be "in full compensation for the storage rights herein granted and in lieu of all delay rental or royalty due or to become due for the right to produce or for the production of oil and gas" in the land hereinbefore described. Instead, the parties carefully circumscribed the impact storage would have on other separate substrata that might be used to accomplish the other fundamental purpose of entering into the lease.

The lease having provided defendant with an option to drill or not drill during the duration of time in which a delay rental was due, and the lease having evidenced a clear intent that the payment of storage rental would be adequate compensation only for the storage rights granted and the corresponding portion of the substrata used for that activity, the question raised is whether an implied covenant to develop and produce oil and gas arose at the expiration of the primary term. Two constructions of the lease are possible. One is that

the payment of the annual gas storage rental is to be construed as a delay rental payment that constitutes adequate compensation for the privilege to drill or not to drill indefinitely into the secondary term, and will continue to be adequate consideration for "the privilege" as long as any portion of the property is used for storage. The other is a construction limiting the privilege of foregoing production through the payment of annual storage rental to the primary term. Defendant advocates a "plain meaning" construction that will support the former, plaintiffs a construction based on a traditional understanding in the industry and case law that supports the later. We believe that the later construction must prevail for several reasons.

First, defendant's construction fails to garner the parties' intent from a reading of the entire agreement and would effectively eliminate any obligation by the lessee to ever pursue a fundamental purpose of the conveyance, which purpose was at the every least equal to the purpose of developing the property for the storage of gas. The notion that the lessee merely has no obligation to develop the property as long as some portion of it is used for storage renders all but a few sentences of the lease superfluous. It likewise deprives the lessor of the basic value of the conveyance and the reasonable expectation that the leasehold would be developed to the fullest extent practical for the mutual benefit of both parties. We are not at liberty to adopt such a construction. *See Stewart,* 266 A.2d at 263 ("Where the language of a contract ... is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would actually execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.") (*quoting Wilkes–Barre*

*Twp. School Dist. v. Corgan,* 403 Pa. 383, 170 A.2d 97, 98 (1961)).

Second, such a construction would be contrary to Pennsylvania's historical treatment of oil and gas leases. The Supreme Court long ago recognized that the clear purpose of an oil and gas lease providing for production royalties based on quantity and per well formulas is to develop the property for the mutual benefit of both parties, regardless of whether the lease contains an expressed provision obligating the lessee to do so. *Ray,* 20 A. at 1066–67. The obligation to pay delay rentals is intended to spur the lessee toward development and compensate the lessor for the election to delay. *Id.* at 1066; *Hill v. Joy,* 149 Pa. 243, 24 A. 293 (1892) (implied covenant to mine in a proper manner with reasonable diligence is an inseparable inference drawn from the manifest purpose of conveying the right to extract the resource, subject to a reservation of a certain portion in the grantor in the form of royalties). And it is settled that the fulfillment of this basic purpose is not displaced by mere initial token production followed by the payment of a modest sum under the lease for a number of years where there has been no further effort to develop and operate the leasehold. *Penrose v. Penn Forest Coal Co.,* 289 Pa. 519, 137 A. 670, 671 (1927); *see also Marshall,* 47 A. at 929 (liquidated damages in the form of a fixed delay rental merely compensates the lessor for the lessee's delinquency in commencing production). Thus, the notion that all rights to production can be maintained beyond the primary term through the payment of a nominal delay rental in the form of storage privileges for non-native gas, without more, is inconsistent with the historic development of Pennsylvania's jurisprudence governing oil and gas leases.

Moreover, defendant's position that the delay rental provisions effectively suspend its obligation to explore and develop the property for production for an indefinite period beyond the expiration of the primary term has been directly refuted by the Supreme Court as being at odds with the presumed intention of the parties in executing and oil and gas lease. When the fixed term lease came into general use in the 1890's a variation of the habendum clause provided that the lessee would hold the premises for a number of years and thereafter as long as oil and gas were found in paying quantities "or the rental paid thereon." 2 Summers THE LAW OF OIL AND GAS § 290; *see also supra* note 15. In a number of cases lessees argued that such leases could be extended beyond the fixed term by the mere payment of the delay rental referenced in the drilling clause. *Id.* This construction was rejected by the courts as inconsistent with the established rulings grounded in public policy considerations that under "no term" leases a lessee could not postpone development indefinitely by a payment of delay rentals. *Id.* at 289 & 290. The courts also rejected such a construction as being "contrary to the intention of the parties to so word a part of the habendum clause that the lease must terminate within a definite time in absence of production, and then in the next clause destroy that provision by another permitting the lease to run indefinitely by the payment of a nominal delay rental." *Id.* at 290. The courts uniformly limited the phrase to mean gas and oil rentals to be paid after production (*i.e.*, royalties), as opposed to delay rentals. *Id.* (collecting cases). The Supreme Court "reached this [same] conclusion on a construction of the lease as a whole," *id.*, and advanced the following pertinent rational:

> In other words, [the lessee] claims to have the right, on payment of this comparatively insignificant rental or penalty,

to postpone indefinitely all operations for the development of the property, and thus defeat the expressed purpose of the parties, and render inoperative the principle covenants of its assignor. This is an extraordinary claim, and is based on a construction which makes a lease a mere option, and the so-called "rental" the price of it. The five words relied on to accomplish this result are found in and conclude the habendum clause of the agreement. The learned Judge of the Common Pleas thought these words did not warrant the construction contended for, and that they were applicable only to the definite term of two years within which it was manifestly intended by the parties that the property should be developed. He therefore held that the failure of the lessee and his successor to complete a well upon the premises within that term enabled the lessor to terminate the lease upon the expiration of it and in this conclusion we concur.

The primary and essential condition to any extension of the lease after the lapse of two years from its date was the finding of oil or gas in paying quantities within that time, and the secondary condition was that the rent reserved for the oil or gas found should be paid in conformity with the covenants in relation thereto. If we were at liberty to substitute "and" for "or" in the concluding words of the habendum clause, as we might well do if we were construing a will or a statute, there would be no room or basis for the appellant's contention, because upon such substitution the rental mentioned therein would plainly refer to that which the lessor would be entitled to receive after the development of the property, and while oil and gas was found thereon in paying quantities. But fortunately the lease as written fairly

admits of a construction which gives effect to all of its provisions, and to the intention of the contracting parties. *Western Pennsylvania Gas Co. v. George,* 161 Pa. 47, 28 A. 1004 (1894). These teachings equally are applicable to the matter at hand.

Defendant claims to have the extraordinary right to control the production of oil and gas on the property by relying on an insignificant storage rental, thereby defeating the first expressed purpose of the parties. In other words, defendant claims that by engaging in the mere storage of non-native gas, it has availed itself of all rights that could have been extended into the secondary term by diligent operation of the leasehold for the mutual benefit of both parties. Such a construction would be contrary to the parties' intent as reflected in the expressed dual purposes of the granting clause, the "cessation of production" provision in the habendum clause and the provision limiting the payment for storage privileges to full compensation only for the sands where gas may be stored. It would also render a vast majority of the provisions of the lease superfluous and make a mere modest penalty clause the central and controlling feature of the agreement. W hen the lease is read as a whole with an understanding of the prevalent industry customs and practices in the 1950's, we see no support for defendant's position.

Third, defendant's construction would provide it with vested property rights in the oil and gas under the property for the mere payment of a delay rental, a proposition which is inconsistent with the traditional construction of the property rights conveyed by an oil and gas lease. As previously noted, the initial title conveyed by an oil and gas lease is inchoate, and for the purposes of exploration only. *Calhoon,* 50 A. at 968. The lessee may per-

fect its inchoate title to a vested interest by bringing the property into production. At that juncture the lessee gains a fee simple determinable in the oil and gas, and may continue to reap the benefit of his efforts in accordance with the terms and conditions of the lease. *Brown,* 255 A.2d at 511 (interpreting traditional habendum clause of oil and gas lease to convey fee simple determinable once production in paying quantities has occurred). Defendant has failed to advance any case where the mere payment of a delay rental beyond the term of the lease has been held to create a vested corporeal hereditament (such as in a coal lease that amounts to the sale of the coal in place). *See Hummel,* 395 Pa. at 554–57, 150 A.2d at 861–63. Nor is there any sound reason in fact or law to recognize such a right under the circumstances of this case.

 In summary, construing the lease as advocated by defendant would be contrary to several rules of construction governing the interpretation of such instruments. Where a oil and gas lease is ambiguous, it is proper to construe the instrument against the party preparing it or using the words which give rise to doubt. *Laney v. Columbia Natural Gas Co.,* 305 Pa. 527, 158 A. 266, 269 (1931); *Stewart,* 266 A.2d at 264 (where grant of mineral rights is susceptible more than one interpretation, it is proper to construe the instrument in favor of the grantor where the grantee drafted the instrument). This principle is particularly applicable where the ambiguity involves the severance of mineral rights. *Pomposini,* 580 A.2d at 778. Similarly, where an ambiguity in an oil and gas lease makes the instrument susceptible of two constructions, one of which is reasonable in light of industry practices and one which is implausible and inconsistent with such practices and the fair implication of the terms employed, it is

appropriate to construe the instrument narrowly and in a manner consistent with common industry practices and understandings. *Daset Mining Corp.*, 473 A.2d at 592; *Pomposini*, 580 A.2d at 778; *Babb*, 687 A.2d at 1121–23 (continuation of leasehold into secondary term by lessor's domestic use of gas from well on property held inconsistent with settled industry understanding of "production" and thus insufficient activity to preclude the lease from expiring on its own terms).

Interpreting the lease in the manner advanced by defendant would grant defendant an expansive panoply of property rights based on an obscure and unnatural reading of the instrument. It would eliminate any obligation on the lessee to ever explore and develop the property for production and thus would deprive the lessor of the most basic expressed purpose of the lease and the major value to be obtained from the transaction. It would similarly convert an expressed form of delay rentals into adequate consideration for the outright purchase of a fee simple determinable interest in the oil and gas under the property without the payment of any royalties. Such a construction is at odds with both the basic provisions and structure of the lease itself and the well-established construction given to those provisions by the courts. Accordingly, the lease cannot be construed as creating a secondary term that encumbers production rights merely by complying with the delay rental clause in the secondary term through the payment of an annual storage rental. *Compare Hutchison*, 519 A.2d at 390–91 (construction of lease in a manner that would create perpetual term by mere payment of advanced minimum royalty inappropriate where construction would in effect deprive landowner of basic purpose of the lease: to mine the property for the mutual benefit of both parties). It follows that defendant's inchoate right to enjoy the fruits from the production of oil and gas expired at the end of the primary term.

■ While the above analysis sufficiently supports the relief plaintiffs request, their contentions concerning the doctrine of abandonment also have merit. In other words, even assuming *arguendo* that the production rights granted to defendant did not expire at the end of the term of the lease, defendant has abandoned those rights under the controlling principles of equity. Defendant did not seek to develop the property for production during the primary term or at any time in the last forty-eight years. Defendant has not drilled any wells in the past two decades and sold all of its drilling equipment many years ago. Defendant has never expressed an intent to operate the property in a manner reasonably calculated to develop it fully for the mutual benefit of both parties. These undisputed facts warrant a declaration of abandonment as to all rights not consumed by or essential to defendant's storage of non-native gas at the 100 foot sands.

The application of the doctrine of abandonment to an oil and gas lease was first recognized by the Supreme Court in *Aye v. Philadelphia Co.*, 193 Pa. 451, 44 A. 555 (1899), where the court defined the obligations of a lessee when initial exploration of property proves unsuccessful. After recognizing the implied covenant to develop leased property with reasonable diligence arises where the essential consideration is to be derived from royalty payments and after observing that the oil and gas lease in question addressed the lessee' rights in the event oil was produced in paying quantities but did not contain a provision in the event of a dry test well, the court opined:

The authorities are uniformed that, under such circumstances, there is an

implied obligation on the lessee to proceed with the exploration and development of the land with reasonable diligence, according to the usual course of the business, and a failure to do so amounts to an abandonment which will sustain a re-entry by the lessor. Abandonment is a question of fact, to be determined by the acts and intentions of the parties. An unexplained cessation of operations for [four years] gives rise to a fair presumption of abandonment, and, standing alone and admitted, would justify the court in declaring an abandonment as a matter of law. Where material issues of fact remain concerning a potential valid explanation for the failure to proceed with the exploration and development of the land, the question of abandonment is one for the jury. *Id.*

Defendant's failure to prove the property in almost forty-eight years and its sale of all production equipment years ago gives rise to equitable circumstances that sufficiently support a declaration of abandonment of production rights as a matter of law.

A similar scenario was considered by the Supreme Court in *Clark v. Wright*, 311 Pa. 69, 166 A. 775 (1933). There, the lessor sought a determination of the lessee's interest after the lessee had produced gas for fourteen years, shut the well in after the purchaser of the gas ceased operations, paid a rental for a few years and then ceased paying any rentals or royalties. The property remained capable of producing gas in marketable quantities. Noting that the lessor's renumeration is the controlling factor in construing the legal effect of habendum clauses in gas and oil leases, the court distinguished between leases that provide the lessor with compensation based on the volume of production and those that merely provide for a fixed rental unrelated to production and provide no renumeration for the volume of the mineral produced. The court opined:

> Where a lessor's compensation is subject to the volume of production, the period of active production of oil or gas is the measure of the duration of the lease. Where the lessor's compensation is a definite and fixed amount unrelated to the volume of production, the duration of the lease is not measured by the length of time the mineral is actually extracted and marketed, but by the time during which the lease provides that the lessor shall receive the fixed rental. Under these latter circumstances, it can make no difference to the lessor whether 100 or 1,000,000 cubic feet of gas is produced.

*Id.* at 776. Thus, where the parties clearly contemplated that remuneration for production would be based upon a royalty set by volume, the duration of the secondary term is determined by the period of active production. In contrast, where the lessor's remuneration is not contingent upon production in any manner, but instead is based on a fixed rental, the duration of the lease is measured by the period of time over which the lessor is to receive the fixed rental. If any provisions in the lease make the value of the lease increase with production, then the duration of the lease during the secondary term is to be construed as contingent on production in paying quantities unless a clear intent to the contrary is expressed in the lease. *Clark*, 311 Pa. 69, 166 A. at 776 (lease obligating lessee to $300 per annum for each gas well from which gas is marketed made value of lease dependent upon marketing of gas and properly was interpreted by rules governing royalty-based leases).

Here, the parties clearly contemplated that in fulfilling the purpose of exploration and production of oil and gas on the property, the lessor's remunerations would be

measured by the volume of production. All provisions of the lease pertaining to active production obligate the lessee to pay royalties based upon the volume of production. The value of the grant to "drill[ ] and operat[e] for and produc[e] oil and gas" was dependent on the lessee's efforts and success in doing so. Similarly, the parties contemplated that the other basic purpose of the lease, the storage of gas, would only be measured by the fixed per acre rental for the storage of gas until an increased quarterly fee for each well on the property used in storage operations became due. Thus, the value of the lease as a whole was made contingent on the lessee's active development of the leasehold for production.

The Supreme Court, relying on its prior precedent in *Cassell v. Crothers*, 193 Pa. 359, 44 A. 446 (1899), held that in cases were the value to the lessor is dependent on production and production ceases to exist after the expiration of the fixed period, any vested rights expire and any holdover tenancy created is a tenancy in the nature of tenancy at will. The court opined:

> To have held otherwise, in any royalty case where production has ceased, would be most inequitable because the value of the lease to the lessor is thereby made destructible at the will of the lessee.

*Clark*, 166 A. at 776. Although the case could have been resolved on this principle alone, the court also concluded that the defendant's actions were tantamount in law to an offer of surrender. It further opined:

> In effect, the conclusion reached above is that the facts disclose such a relinquishment of the rights of property by the lessees to their lessors, under a lease wherein the rental depends on the volume of production, as is tantamount in law to be an offer of surrender of the

leasehold rights which, to be effective, must be accepted by the lessors. Under a lease of this character [lessees'] acts show an intention to surrender. This intention was effectuated by withdraw of the premises. The failure of [lessees'] market is not a sufficient explanation of their withdraw, for it appears that there was a market for the gas had they been willing to expend a reasonable sum to procure it. It was in April, 1932, more than four years after the withdraw and after [lessors], who were willing to spend such sum, were successfully operating a compressor plant they had connected with the premises, that [lessees] took any action or made any effort to enforce the 1911 lease. If their contention is correct, in a lease on a production or royalty basis, no limit of time could be placed on their failure to comply with the terms of the lease. The land would be continuously subjected to a lease which brought no return to the lessors and the lessors would be without remedy to compel any. The lease would rest as a perpetual cloud on the title, gravely affecting the market value of the surface land.

*Id.* at 777. Under such circumstances the "conclusion of surrender is an equitable one." *Id.* at 778.

The reasoning in *Clark* is applicable to the matter at hand. While defendant has preserved its storage rights in the leasehold with regard to all substrata being used for storage at the expiration of the primary term, defendant cannot continue to hold the production rights and refuse to operate the premises indefinitely where (1) the property contains commercially producible gas at substrata distinct from the sands being used for storage and (2) the lessee has never attempted to develop the property for production at any time during the primary term or the thirty-eight years

after its expiration. To hold otherwise would be tantamount to recognizing a fee simple absolute in defendant in all oil and gas under the surface of the property and would deprive plaintiffs of the central value of entering the lease: to have the property commercially developed for the mutual benefit of both parties in a reasonable period of time.

A similar scenario was presented to the Supreme Court of Kansas in *Rook v. James E. Russell Petroleum, Inc.*, 235 Kan. 6, 679 P.2d 158 (1984). There, the lessors under oil and gas leases brought an action for partial cancellation after the lessee had ceased production on property that had a number of producing wells and elected to pay an annual storage rental and furnish gas to the landowner until a more economically advantageous time in the future. The habendum clause of the leases granted the lessee a perpetual secondary term upon the storage of gas. *Id.* at 160–163. The trial court reviewed the provisions of the lease and held that the habendum clause operated to extend the leases by the storage of gas, but further reasoned that in equity the production rights to the oil and gas conveyed by the leases could be forfeited for failure to comply with the implied covenants of production, while the storage rights remained intact. *Id.* at 163. It further held that the abandonment of production for several years coupled with the wasting of all operating equipment on the premises and the removal of the power source used to operate the wells evidenced a clear intent to abandon the lease until a time when it would become more financially rewarding, and as a result the defendant's production rights were void. *Id.* at 163. The intermediate court of appeals determined that the trial court had inferred an intent to abandon from the lessee's breach of an implied covenant to operate the leasehold efficiently and ordered that the oil and gas lease

be deemed cancelled in the event the lessee did not begin production efforts within sixty days from the date of the court of appeals' judgment. *Id.*

The Supreme Court of Kansas affirmed the trial court. It observed that unlike the usual oil and gas lease that terminates by its own terms when the lessee ceases further production due to unprofitability under an implied application of abandonment, the case presented the rare situation where the leases were continued in force and effect by the expressed provisions of the habendum clause relative to gas storage rights and the lessee had ceased in fulfilling its duty to operate the leasehold diligently and prudently. *Id.* at 166. The court observed that Kansas law had developed the doctrine of implied covenants in a manner consistent with the classification made by the authoritative commentators on the subject, which included the implied covenant to operate the leasehold efficiently that is commonly identified as the implied covenant of diligent and prudent operation. *Id.* at 166 (*citing* 5 Kuntz, OIL AND GAS § 55.1(c) (1978) (comparing classifications by the leading commentators)). And the court's prior precedent as well as precedent from the Supreme Court of the United States supported the proposition that an oil and gas lease may be subject to partial cancellation as to the undeveloped portion of the leasehold based on breach of the implied covenant to develop the property fully following a demand by the lessor for further development. *Id.* at 166. As a result the trial court had "correctly ruled that the oil and gas production portion of these oil and gas leases could be terminated for abandonment of the lease or for failure to comply with the implied covenant of diligent and prudent operations, while the storage rights of [the lessee] were retained intact." *Id.* at 166–167. Because the leases had been developed and had

been producing oil for many years after the primary term, the court upheld the trial court on its finding of abandonment. Specifically, the court opined that terminating production of all wells followed by no further production activity for 15 years, permitting all equipment on the property to waste, and tearing down and removing the pump house and the power source equipment, all combined to constitute an affirmative abandonment of the lessee's production rights. *Id.* at 167.

We believe the Supreme Court of Pennsylvania would follow the teachings and reasoning of *Rook.* Commencing with *Aye v. Philadelphia Co.*, 193 Pa. 451, 44 A. 555 (1899), Pennsylvanian law consistently has recognized that an unexplained failure to develop an oil and gas lease for operations gives rise to a fair presumption of abandonment, and, unless rebutted, justifies a declaration of abandonment as a matter of law. *See id.* at 556 (where lessee fails to pursue development of the leasehold for production with reasonable diligence and in the usual course of business, the failure amounts to an abandonment which will sustain a re-entry by the lessor). And it has continued to recognize this principle over the years. *See, e.g., Calhoon,* 50 A. at 968–69 (failure to explore premises for over nine years after drilling dry well during first year of fifteen year lease constituted an unqualified surrender of whatever rights could be perfected in lessees' inchoate title during primary term); *Clark,* 166 A. at 778 (an unexplained cessation of operations for an unreasonable period of time, without adequate remuneration to the lessor, creates a fair presumption of abandonment or surrender).

Here, defendant failed to conduct any exploration or development of the leasehold during the primary term and in the subsequent thirty-eight years that followed. While the lease has been continued in force and effect by the express provisions of the habendum clause relative to gas storage rights, the lessors and their assigns have been deprived of the primary value of the lease that could only be gained from fulfilling the fundamental purpose of developing the leasehold for production. Defendant sold all of its equipment for production in 1984 and has not been in the business of drilling since that time. Defendant has offered no legally supportable explanation for depriving the lessor of the right to have exploration of the property undertaken and production commenced if oil and gas can be produced in quantities that will result in the payment of royalties. Defendant does not dispute that the property likely can be so developed in a commercially beneficial manner and that such development can occur at substrata distinct from the hundred foot sands where storage is occurring. Under these circumstances a fair presumption of abandonment or surrender has been raised, and a declaration of surrender as a matter of law in the form of an equitable decree is justified.

For the reasons set forth above plaintiff's motion for summary judgment will be granted in a manner consistent with this opinion and defendant's motion will be denied. A status conference will be scheduled with the parties in order to obtain their views on whether further development of the record is necessary before a final decree in equity is entered. An appropriate order will follow.

### ORDER OF COURT

AND NOW, this 6th day of July, 2004, for the reasons set forth in the opinion filed this day, IT IS ORDERED that plaintiffs' motion for summary judgment (Doc. No. 55) be, and the same hereby is, granted in part and an equitable decree will be entered in accordance with the court's rulings following a conference with the parties;

IT FURTHER IS ORDERED that plaintiffs' motion for expedited judgment (Doc. No. 66) be, and the same hereby is, denied as moot;

IT FURTHER IS ORDERED that defendant's motion for summary judgment (Doc. No. 58) be, and the same hereby is, denied; and

IT FURTHER IS ORDERED that a conference be, and the same hereby is, scheduled before this member of the court for *Tuesday, August 3, 2004 at 2:30 p.m.*, Courtroom No. 12, 10th Floor, United States Post Office & Courthouse, Pittsburgh, PA. Plaintiffs shall be present. Defendant shall have a corporate principal present who has binding authority to resolve the case. Counsel shall utilize all reasonable means available to explore a global settlement of this and the other action(s) of the parties currently pending before this member of the court. In the event the parties' efforts toward settlement ultimately prove to be unsuccessful, counsel shall also be prepared to discuss whether any further development of the instant record is necessary before a final decree can be entered.