J-A29035-19

2020 PA Super 113

| | | |
|---|---|---|
| DONALD AND SHIRLEY WILSON, JAMES AND MARIE WILSON AND LARA S. WILSON SHIELDS | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : | |
| | : | No. 734 WDA 2019 |
| SNYDER BROTHERS, INC., PENNENERGY RESOURCES, LLC, WINFIELD RESOURCES, LLC | : : : : | |

Appeal from the Order Entered March 6, 2019
In the Court of Common Pleas of Armstrong County Civil Division at
No(s):  No. 2018-0788-Civil

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                    **FILED MAY 11, 2020**

Donald Wilson, Shirley Wilson, James Wilson, Marie Wilson and Lara S.

Wilson Shields (collectively, "the Wilsons") appeal the March 6, 2019 order of

the Armstrong County Court of Common Pleas (trial court) sustaining the

preliminary objections of Appellees, Snyder Brothers, Inc. ("Snyder"),

PennEnergy Resources, LLC ("PennEnergy"), and Winfield Resources, LLC

("Winfield").  The order on review concerns the disputed validity of several oil

and gas leases between the parties, as well as the sufficiency of the Wilsons'

allegations.  We affirm.

_____

* Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

The facts pertinent to this appeal are taken from the Wilsons' amended complaint and its exhibits. In June 2003, Donald and Shirley Wilson entered into two agreements with Snyder to lease land in Armstrong County, Pennsylvania. The first lease concerned a 253-acre tract ("DS Wilson Lease 1") and the second lease concerned a 140-acre tract ("DS Wilson Lease 2"). James and Marie Wilson entered a similar agreement as to another 80-acre tract with Snyder in July 2003 ("JM Wilson Lease"). These leases permitted Snyder to enter onto the Wilsons' respective properties, engage in drilling operations, and extract oil and natural gas.

All three of the above agreements contained identical provisions as to the lease term and the payment Snyder would owe for delays in beginning its drilling operations. The agreements provided in identical language that Snyder would have the right to (a) drill within 180 days of the date the lease terms began (the primary term); and (b) extend the lease period by making annual delay rental payments if drilling did not begin during that primary term:

> Lessee has the right to enter upon the Property to drill for oil and gas at any time within 180 days . . . from the date hereof and as long thereafter as oil or gas or either of them is produced from the Property or as operations continue for the production of oil or gas, or as Lessee shall continue to pay Lessors $3.00 dollars per acre per year as delayed rentals, or until all oil and gas has been removed from the Property, whichever shall last occur.

- 2 -

Amended Complaint, Exhibits 1, 2 and 3, at Paragraph 3.

Snyder did not begin drilling operations on any of the subject properties until 2010 after the primary terms had elapsed. Accordingly, between 2003 and 2010, Snyder timely paid the Wilsons annual delay rental payments. *Id*. at Paragraphs 31-37. The Wilsons accepted those payments and did not dispute the validity of their respective leases throughout that period. Had the Wilsons wanted to dispute the validity of their leases, the notice and cure provisions of their agreements required them to alert Snyder of the alleged breach within 60 days from the date of its occurrence. *See* Amended Complaint, Exhibits 1, 2 and 3, at Paragraph 11.

In May 2010, Snyder obtained a permit to drill a vertical well on the property subject to the DS Wilson Lease 1. Weeks later, Donald and Shirley Wilson entered into an amended agreement with Snyder, which provided in pertinent part that all the terms of the original DW 1 Lease were ratified:

> **Ratification**. Lessors hereby ratify the Lease as being in full force and effect and not in breach, and that the said Lease will remain in full force and effect in accordance with its terms as amended by this Oil and Gas Lease Amendment Agreement.

Amended Complaint, Exhibit 5, at Paragraph 4. The original terms of the DS Wilson Lease 2 were never amended or affected by amendments to the DS Wilson 1 Lease. James and Marie Wilson entered into a substantially similar amended agreement at around the same time, ratifying all the terms of the original JM Wilson Lease from 2003 and stipulating that Snyder was not in breach. *See* Amended Complaint, at Paragraph 43 (citing Exhibit 6).

In 2010, Snyder began drilling the vertical well (the Well) on the property governed by the amended DS Wilson Lease 1. *Id*. at Paragraph 57. Soon after those operations began, in July 2010, Snyder recorded a Unit Operation Designation to "unitize" the Well, including the properties subject to the amended agreements between Snyder and the Wilsons. The unitized area also included surrounding properties that were not subject to the Wilsons' leases. The total area of the unitized properties totaled 614 acres (unitized area). The Wilsons' original leases permitted unitization, and the terms of the DS Wilson 1 Lease and the JM Wilson Lease were ratified by the 2010 amendments. *See* Amended Complaint, Exhibits 1 and 3, at Paragraph 4 (permitting unitization); *see also* Amended Complaint, Exhibits 5 and 6, at Paragraph 4 (ratifying terms of original leases).

In 2012, Snyder assigned to Winfield its amended lease agreements with the Wilsons. *See* Amended Complaint, at Paragraph 60. Simultaneously, through its managing member (Snyder), Winfield assigned 64% of those lease agreements to PennEnergy. *Id*. at Paragraph 61. In the PennEnergy assignment, Snyder reserved the right to the Well and "the area adjacent to and within a 250-foot radius around the wellbore that has been or may be stimulated by fracture or otherwise[.]" *Id*. at Paragraph 63. Winfield also cross-assigned some of its interests to PennEnergy, resulting in Winfield and PennEnergy "retaining a 19.93% and 80.07% interest in the Wilson Lease Agreements, respectively." *Id*. at Paragraph 65.

Snyder continued to extract gas from the Well and pay royalties to the owners of property throughout the unitized area. *Id*. at Paragraph 68. The Wilsons aver that from 2011 to the present day, the Well has only produced gas located on the property immediately surrounding it, within the tract governed by the DS Wilson 1 Lease. *Id*. at Paragraph 69.

In 2017, PennEnergy requested Donald and Shirley Wilson to ratify and amend the previously amended agreement from 2010. *Id*. at Paragraph 70. They declined the proposed amendment and ratification because they believed that all their previous lease agreements had already terminated. *Id*. at Paragraphs 71-72.

In 2017, the Wilsons demanded that PennEnergy and Snyder/Winfield vacate their property and cease producing gas from the Well. *Id*. at Paragraph 74. In 2018, the Wilsons repeated those demands and further demanded that Snyder stop paying royalties to other property owners within the unitized area but laying outside of Snyder's reserved 250-foot radius around the Well.

Nevertheless, the Well remained in operation. Snyder continued to pay monthly royalties for gas produced from the Well as to all acreage located within the unitized property, including property owners other than the Wilsons. Since 2017, the Wilsons have refused to accept royalty payments for gas produced from the Well.

**B.**

The Wilsons filed suit, alleging in their amended complaint that none of their leases were valid.  Specifically, in Counts I, V, VII, IX, X and XI, XII, XIII, XIV of their amended complaint, the Wilsons sought declaratory judgments that the original DS Wilson Lease 1 and the original JM Wilson Lease had terminated because drilling operations did not commence until 2010, years after the primary term of 180 days had elapsed.  They also alleged in those counts that from 2011 to the present, their leases terminated due to impermissible "shut-in" periods:

> Upon information and belief, the . . . Well has intermittently produced gas for approximately seven (7) years and has never continuously produced gas for any consecutive calendar year since production began in or around June 2011.

*Id*. at Paragraph 50.  The Wilsons asserted that the breach occurred "at various times."  *Id*. at Paragraph 55.

In Counts II and VIII, the Wilsons alleged trespass because drilling operations continued on their property after the leases terminated.  The Wilsons alleged a claim of conversion in Count III based on the continued gas production on their property without consent.  In Counts IV and VI, they alleged a breach of the covenant of good faith and fair dealing and "bad faith unitization."[1]

---

[1] According to the Wilsons, Snyder's remaining interest in the leases consists of a 250-foot radius around the Well, which sits on the property subject to the

Snyder/Winfield and PennEnergy filed several preliminary objections to the Wilsons' amended complaint. Snyder/Winfield and PennEnergy objected in the nature of a demurrer[2] to the Wilsons' declaratory judgment claims, asserting that the original leases did not terminate from 2003 to 2010 because:

- The Wilsons accepted delay rental payments in all of the intervening years;

- The Wilsons ratified the leases in 2010, and accepted royalty payments after drilling had commenced; and

- The Wilsons never gave required notice that they considered the leases to be void or terminated.

Finding that the Wilsons had failed to allege facts showing that their original leases had terminated, the trial court dismissed the Wilsons' request for declaratory judgments to that effect. *See* Trial Court Opinion, 3/6/2019, at 11-12.

_____

DS Wilson Lease 1, divesting Snyder of rights to any gas outside of that radius. *See* Amended Complaint, at Paragraphs 65-66. The Wilsons claim that the unitization of such property was done in bad faith because no owner of property outside of the 250-foot radius is entitled to royalties. *Id*.

[2] A preliminary objection in the nature of a demurrer may be sustained if it "appears from the face of the complaint that recovery upon the facts alleged is not permitted as a matter of law." *Am. Express Bank, FSB v. Martin*, 200 A.3d 87, 94 (Pa. Super. 2018) (quoting *Kelly v. Kelly*, 887 A.2d 788, 790-91 (Pa. Super. 2005)). An appellate court applies that same standard on review of a trial court's order sustaining a demurrer. *See Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006).

As to the Wilsons' requests for declaratory judgments that their amended lease agreements had terminated due to shut-ins, the trial court sustained a preliminary objection that the claims lacked sufficient specificity.[3] *Id*. at 8-10. The Wilsons were given leave to re-plead their allegations so as to include more specific dates on which the shut-ins occurred, but the Wilsons declined to amend their pleadings or obtain any pre-complaint discovery. *Id*. at 9-10. Necessarily, the trial court dismissed the trespass and conversion counts because they were resolved by the determination that the subject leases were valid.[4] *Id*. at 12-13. The Wilsons timely appealed, and both the Wilsons and the trial court complied with Pa.R.A.P. 1925.[5]

_____

[3] "The material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. No. 1019(a). "Insufficient specificity in a pleading" may be grounds for a preliminary objection. Pa.R.C.P. No. 1028(a)(3). A preliminary objection of this type may be granted if the defendant has not been given enough information to ascertain "without question upon what grounds to make his defense." *Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. 2006) (quoting *Ammlung v. City of Chester*, 302 A.2d 491, 498 n.36 (Pa. Super. 1973; 1 Goodrich-Amram § 1017(b)-9)).

[4] The trial court also overruled the preliminary objections regarding the breach of the covenant of good faith and improper unitization, but that ruling is not at issue here because the Wilsons have since voluntarily dismissed those claims.

[5] The Wilsons appeal from the trial court's order entered March 6, 2019, which, in part, granted them leave to amend their shut-in claims after sustaining preliminary objections. Such a ruling is typically interlocutory and not immediately reviewable. *See Mier v. Stewart*, 683 A.2d 581 (Pa. Super. 1996). However, this Court has appellate jurisdiction because the Wilsons declined to amend their pleadings, and by its order dated April 25, 2019, the trial court dismissed without prejudice all other remaining claims, deeming its

**II.**

**A.**

The Wilsons now contend that the trial court erred in holding that the DS 1 Wilson Lease and the JM Wilson Lease remained in effect from 2003 to 2010. The key facts are undisputed. In 2003, the Wilsons agreed to allow Snyder to drill for oil and gas on their property. For seven years, they accepted annual delay rental payments which purported to extend the leases under their agreements' terms. Crucially, in 2010, the Wilsons ratified their original leases, stipulating to those agreements "being in full force and effect[.]"

In making their argument that their original leases nevertheless terminated after the primary terms elapsed, the Wilsons rely on one case – *Hite v. Falcon Partners*, 13 A.3d 942 (Pa. Super. 2011), where this Court held that delay rental payments alone do not extend the primary term of an oil and gas lease if drilling has not yet commenced. We found in *Hite* that such an arrangement would be "inconsistent with the established rulings grounded in public policy" that lessees should not be able to "postpone development indefinitely by a payment of delay rentals." *Id*. at 948 (quoting *Jacobs v. CNG Trans. Corp*, 332 F.Supp. 2d 759, 790 (Pa. E.D. 2004)).

_____

earlier order of March 6, 2019, to be a final reviewable order. *See* Pa.R.A.P. 341. A 1925(a) opinion was not filed, as the trial court relied on the memorandum attached to the subject order.

Unlike the lessors in **Hite**, the Wilsons ratified their original leases beyond the primary term and did not seek to void their amended leases until years after drilling had already begun. As a purely contractual matter, the Wilsons waived any claim they may have had to dispute the validity of the subject leases based on non-production from 2003 until the 2010 ratification in their amended agreements. Those circumstances materially distinguish this case from **Hite** because in that case, drilling had not begun as of the date suit was filed, and there was no ratification of the original lease beyond the primary term.

Accordingly, the trial court properly ruled as a matter of law that the Wilsons' original leases remained in effect from the time they were entered until the date of their ratification in the amended agreements.

**B.**

The trial court also correctly determined that the Wilsons' pleadings lacked sufficient specificity with respect to the alleged non-continuous gas production (or shut-ins) after drilling began.[6]

The Wilsons vaguely alleged that periods of shut-in occurred from 2010 to 2017, violating their leases' requirement of "actual and continuous gas

---

[6] The standard of review is whether the trial court misapplied the law or abused its discretion. **See Rambo v. Greene**, 906 A.2d 1232, 1235 (Pa. Super. 2006) ("[T]his Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion.").

production." *See* Amended Complaint, at Paragraphs 50-56. Yet, the Wilsons never identified the length of the alleged shut-ins or why they believe they occurred; nor did they attempt to gather pre-complaint discovery as to those missing pieces of their allegations. *See* Pa.R.C.P. No. 4003.8(a) ("A plaintiff may obtain pre-complaint discovery where the information sought is material and necessary to the filing of the complaint and the discovery will not cause unreasonable annoyance, embarrassment, oppression, burden or expense to any person or property.").

Without a more precise description of the alleged shut-ins, Snyder/Winfield and PennEnergy cannot determine whether any potential defenses are applicable, such as the Wilsons' failure to give timely notice of a breach. Thus, the Wilsons' shut-in claims lacked the required specificity, and the trial court did not err in sustaining preliminary objections on that basis. Regardless, the Wilsons accepted royalty payments from 2011 until 2017. Therefore, even if the Wilsons could sufficiently assert a shut-in period during that time, their acceptance of payment and lack of notice of a breach would establish that their leases remained valid during that time frame.[7]

Order affirmed.

---

[7] The trial court declined to rule on the validity of the disputed unitization of areas surrounding the Wilsons' property, the validity of the DS Wilson 2 Lease, and any other issues related to the adequacy of the Wilsons' royalty payments. *See* Trial Court Opinion, 3/6/2019, at 12 n.2. As a result, those issues are not now before us and our decision here has no bearing on such claims.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2020